SHELTON ET AL. *v.* TUCKER ET AL.

No. 14.   Argued November 7, 1960.—Decided December 12, 1960.*

*Robert L. Carter* argued the cause for appellants in No. 14.   With him on the brief were *Thad D. Williams, Harold B. Anderson* and *George Howard, Jr.*

*Together with No. 83, *Carr et al.* v. *Young et al.*, on certiorari to the Supreme Court of Arkansas.

*Herschel H. Friday, Jr.* and *Louis L. Ramsay, Jr.* argued the cause for appellees in No. 14. With them on the brief were *E. Harley Cox* and *Robert V. Light.*

*Edwin E. Dunaway* argued the cause and filed a brief for petitioners in No. 83.

*Robert V. Light* and *Herschel H. Friday, Jr.* argued the cause for respondents in No. 83. With them on the briefs were *Bruce Bennett,* Attorney General of Arkansas, and *Thorp Thomas,* Assistant Attorney General.

MR. JUSTICE STEWART delivered the opinion of the Court.

An Arkansas statute compels every teacher, as a condition of employment in a state-supported school or college, to file annually an affidavit listing without limitation every organization to which he has belonged or regularly contributed within the preceding five years. At issue in these two cases is the validity of that statute under the Fourteenth Amendment to the Constitution. No. 14 is an appeal from the judgment of a three-judge Federal District Court upholding the statute's validity, 174 F. Supp. 351. No. 83 is here on writ of certiorari to the Supreme Court of Arkansas, which also held the statute constitutionally valid. 231 Ark. 641, 331 S. W. 2d 701.

The statute in question is Act 10 of the Second Extraordinary Session of the Arkansas General Assembly of 1958. The provisions of the Act are summarized in the opinion of the District Court as follows:

"Act 10 provides in substance that no person shall be employed or elected to employment as a superintendent, principal or teacher in any public school in Arkansas, or as an instructor, professor or teacher in any public institution of higher learning in that State until such person shall have submitted to the appro-

priate hiring authority an affidavit listing all organizations to which he at the time belongs and to which he has belonged during the past five years, and also listing all organizations to which he at the time is paying regular dues or is making regular contributions, or to which within the past five years he has paid such dues or made such contributions. The Act further provides, among other things, that any contract entered into with any person who has not filed the prescribed affidavit shall be void; that no public moneys shall be paid to such person as compensation for his services; and that any such funds so paid may be recovered back either from the person receiving such funds or from the board of trustees or other governing body making the payment. The filing of a false affidavit is denounced as perjury, punishable by a fine of not less than five hundred nor more than one thousand dollars, and, in addition, the person filing the false affidavit is to lose his teaching license." 174 F. Supp. 353–354.[1]

---

[1] The statute is in seven sections. Section 1 provides: "It is hereby declared that the purpose of this act is to provide assistance in the administration and financing of the public schools of Arkansas, and institutions of higher learning supported wholly or in part by public funds, and it is hereby determined that it will be beneficial to the public schools and institutions of higher learning and the State of Arkansas, if certain affidavits of membership are required as hereinafter provided."

Section 2 provides: "No superintendent, principal, or teacher shall be employed or elected in any elementary or secondary school by the district operating such school, and no instructor, professor, or other teacher shall be employed or elected in any institution of higher learning, or other educational institution supported wholly or in part by public funds, by the trustees or governing authority thereof, until, as a condition precedent to such employment, such superintendent, principal, teacher, instructor or professor shall have filed with such board

These provisions must be considered against the existing system of teacher employment required by Arkansas law. Teachers there are hired on a year-to-year basis. They are not covered by a civil service system, and they have no job security beyond the end of each school year. The closest approach to tenure is a statutory provision for the automatic renewal of a teacher's contract if he is not notified within ten days after the end of a school year that the contract has not been renewed. Ark. 1947 Stat. Ann. § 80–1304 (b) (1960); *Wabbaseka School District No. 7 v. Johnson,* 225 Ark. 982, 286 S. W. 2d 841.

The plaintiffs in the Federal District Court (appellants here) were B. T. Shelton, a teacher employed in the Little Rock Public School System, suing for himself and others similarly situated, together with the Arkansas Teachers Association and its Executive Secretary, suing for the benefit of members of the Association. Shelton had been

---

of trustees or governing authority an affidavit as to the names and addresses of all incorporated and/or unincorporated associations and organizations that such superintendent, principal, teacher, instructor or professor is or within the past five years has been a member of, or to which organization or association such superintendent, principal, teacher, instructor, professor, or other teacher is presently paying, or within the past five years has paid regular dues, or to which the same is making or within the past five years has made regular contributions."

Section 3 sets out the form of affidavit to be used.

Section 4 provides: "Any contract entered into by any board of any school district, board of trustees of any institution of higher learning, or other educational institution supported wholly or in part by public funds, or by any governing authority thereof, with any superintendent, principal, teacher, instructor, professor, or other instructional personnel, who shall not have filed the affidavit required in Section 2 hereof prior to the employment or election of such person and prior to the making of such contracts, shall be null and void and no funds shall be paid under said contract to such superintendent, principal, teacher, instructor, professor, or other instructional per-

employed in the Little Rock Special School District for twenty-five years. In the spring of 1959 he was notified that, before he could be employed for the 1959–1960 school year, he must file the affidavit required by Act 10, listing all his organizational connections over the previous five years. He declined to file the affidavit, and his contract for the ensuing school year was not renewed. At the trial the evidence showed that he was not a member of the Communist Party or of any organization advocating the overthrow of the Government by force, and that he was a member of the National Association for the Advancement of Colored People. The court upheld Act 10, finding the information it required was "relevant," and relying on several decisions of this Court, particularly *Garner* v. *Board of Public Works of Los Angeles,* 341 U. S. 716; *Adler* v. *Board of Education,* 342 U. S. 485; *Beilan* v.

sonnel; any funds so paid under said contract to such superintendent, principal, teacher, instructor, professor, or other instructional personnel, may be recovered from the person receiving the same and/or from the board of trustees or other governing authority by suit filed in the circuit court of the county in which such contract was made, and any judgment entered by such court in such cause of action shall be a personal judgment against the defendant therein and upon the official bonds made by such defendants, if any such bonds be in existence."

Section 5 provides that a teacher filing a false affidavit shall be guilty of perjury, punishable by a fine, and shall forfeit his license to teach in any school or other institution of learning supported wholly or in part by public funds.

Section 6 is a separability provision.

Section 7 is an emergency clause, reading in part as follows:

"It is hereby determined that the decisions of the United States Supreme Court in the school segregation cases require solution of a great variety of local public school problems of considerable complexity immediately and which involve the health, safety and general welfare of the people of the State of Arkansas, and that the purpose of this act is to assist in the solution of these problems and to provide for the more efficient administration of public education."

*Board of Education,* 357 U. S. 399; and *Lerner* v. *Casey,* 357 U. S. 468.[2]

The plaintiffs in the state court proceedings (petitioners here) were Max Carr, an associate professor at the University of Arkansas, and Ernest T. Gephardt, a teacher at Central High School in Little Rock, each suing for himself and others similarly situated. Each refused to execute and file the affidavit required by Act 10. Carr executed an affirmation [3] in which he listed his membership in professional organizations, denied ever having been a member of any subversive organization, and offered to answer any questions which the University authorities might constitutionally ask touching upon his qualifications as a teacher. Gephardt filed an affidavit stating that he had never belonged to a subversive organization, disclosing his membership in the Arkansas Education Association and the American Legion, and also offering to answer any questions which the school authorities might constitutionally ask touching upon his qualifications as a teacher. Both were advised that their failure to comply with the requirements of Act 10 would make impossible their re-employment as teachers for the following school year. The Supreme Court of Arkansas upheld the constitutionality of Act 10, on its face and as applied to the petitioners. 231 Ark. 641, 331 S. W. 2d 701.

## I.

It is urged here, as it was unsuccessfully urged throughout the proceedings in both the federal and state courts, that Act 10 deprives teachers in Arkansas of their

---

[2] In the same proceeding the court held constitutionally invalid an Arkansas statute making it unlawful for any member of the National Association for the Advancement of Colored People to be employed by the State of Arkansas or any of its subdivisions. 174 F. Supp. 351.

[3] The affirmation recited that Carr was "conscientiously opposed to taking an oath or swearing in any form . . . ."

rights to personal, associational, and academic liberty, protected by the Due Process Clause of the Fourteenth Amendment from invasion by state action. In considering this contention, we deal with two basic postulates.

*First.* There can be no doubt of the right of a State to investigate the competence and fitness of those whom it hires to teach in its schools, as this Court before now has had occasion to recognize. "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern." *Adler* v. *Board of Education,* 342 U. S. 485, 493. There is "no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors." *Beilan* v. *Board of Education,* 357 U. S. 399, 406.[4]

This controversy is thus not of a pattern with such cases as *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, and *Bates* v. *Little Rock,* 361 U. S. 516. In those cases the Court held that there was no substantially relevant correlation between the governmental interest asserted and the State's effort to compel disclosure of the membership lists involved. Here, by contrast, there can be no question of the relevance of a State's inquiry into the fitness and competence of its teachers.[5]

*Second.* It is not disputed that to compel a teacher to disclose his every associational tie is to impair

---

[4] The actual holdings in *Adler* and *Beilan,* involving the validity of teachers' discharges, are not relevant to the present case.

[5] The declared purpose of Act 10 is "to provide assistance in the administration and financing of the public schools . . . ." The declared justification for the emergency clause is "to assist in the solution" of problems raised by "the decisions of the United States Supreme Court in the school segregation cases." See note 1. But neither the breadth and generality of the declared purpose nor the possible irrelevance of the emergency provision detracts from the existence of an actual relevant state interest in the inquiry.

that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Bates* v. *Little Rock, supra,* at 522–523. Such interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made—those who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain.

The statute does not provide that the information it requires be kept confidential. Each school board is left free to deal with the information as it wishes.[6] The record contains evidence to indicate that fear of public disclosure is neither theoretical nor groundless.[7] Even if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy. Public exposure, bringing with it the possibility of public pressures upon school boards to discharge teachers who belong to unpopular or minority

---

[6] The record contains an opinion of the State Attorney General that "it is an administrative determination, to be made by the respective Boards, as to the disclosure of information contained in the affidavits." The Supreme Court of Arkansas has held only that "the affidavits *need* not be opened to public inspection . . . ." 231 Ark. 641, 646, 331 S. W. 2d 701, 704. (Emphasis added.)

[7] In the state court proceedings a witness who was a member of the Capital Citizens Council testified that his group intended to gain access to some of the Act 10 affidavits with a view to eliminating from the school system persons who supported organizations unpopular with the group. Among such organizations he named the American Civil Liberties Union, the Urban League, the American Association of University Professors, and the Women's Emergency Committee to Open Our Schools.

organizations, would simply operate to widen and aggravate the impairment of constitutional liberty.

The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. "By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers . . . has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers." *Wieman* v. *Updegraff,* 344 U. S. 183, 195 (concurring opinion). "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate . . . ." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250.

## II.

The question to be decided here is not whether the State of Arkansas can ask certain of its teachers about all their organizational relationships. It is not whether the State can ask all of its teachers about certain of their associational ties. It is not whether teachers can be asked how many organizations they belong to, or how much time they spend in organizational activity. The question is whether the State can ask every one of its teachers to disclose every single organization with which he has

been associated over a five-year period. The scope of the inquiry required by Act 10 is completely unlimited. The statute requires a teacher to reveal the church to which he belongs, or to which he has given financial support. It requires him to disclose his political party, and every political organization to which he may have contributed over a five-year period. It requires him to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness.

In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.[8] The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.[9]

In *Lovell* v. *Griffin*, 303 U. S. 444, the Court invalidated an ordinance prohibiting all distribution of literature at any time or place in Griffin, Georgia, without a license, pointing out that so broad an interference was unnecessary to accomplish legitimate municipal aims. In

---

[8] In other areas, involving different constitutional issues, more administrative leeway has been thought allowable in the interest of increased efficiency in accomplishing a clearly constitutional central purpose. See *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Jacob Ruppert* v. *Caffey,* 251 U. S. 264; *Schlesinger* v. *Wisconsin,* 270 U. S. 230, 241 (dissenting opinion) ; *Queenside Hills Co.* v. *Saxl,* 328 U. S. 80, 83. But cf. *Dean Milk Co.* v. *Madison,* 340 U. S. 349.

[9] See Freund, Competing Freedoms in American Constitutional Law, 13 U. of Chicago Conference Series 26, 32–33; Richardson, Freedom of Expression and the Function of Courts, 65 Harv. L. Rev. 1, 6, 23–24; Comment, Legislative Inquiry into Political Activity: First Amendment Immunity From Committee Interrogation, 65 Yale L. J. 1159, 1173–1175.

*Schneider* v. *State,* 308 U. S. 147, the Court dealt with ordinances of four different municipalities which either banned or imposed prior restraints upon the distribution of handbills. In holding the ordinances invalid, the Court noted that where legislative abridgment of "fundamental personal rights and liberties" is asserted, "the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." 308 U. S., at 161. In *Cantwell* v. *Connecticut,* 310 U. S. 296, the Court said that "[c]onduct remains subject to regulation for the protection of society," but pointed out that in each case "the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." 310 U. S., at 304. Illustrations of the same constitutional principle are to be found in many other decisions of the Court, among them, *Martin* v. *Struthers,* 319 U. S. 141; *Saia* v. *New York,* 334 U. S. 558; and *Kunz* v. *New York,* 340 U. S. 290.

As recently as last Term we held invalid an ordinance prohibiting the distribution of handbills because the breadth of its application went far beyond what was necessary to achieve a legitimate governmental purpose. *Talley* v. *California,* 362 U. S. 60. In that case the Court noted that it had been "urged that this ordinance is aimed at providing a way to identify those responsible for fraud, false advertising and libel. Yet the ordinance is in no manner so limited . . . . Therefore we do not pass on the validity of an ordinance limited to prevent these or any other supposed evils. This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires." 362 U. S., at 64.

The unlimited and indiscriminate sweep of the statute now before us brings it within the ban of our prior cases. The statute's comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness and competency of its teachers. The judgments in both cases must be reversed.

*It is so ordered.*

Mr. Justice Frankfurter, dissenting.

As one who has strong views against crude intrusions by the state into the atmosphere of creative freedom in which alone the spirit and mind of a teacher can fruitfully function, I may find displeasure with the Arkansas legislation now under review. But in maintaining the distinction between private views and constitutional restrictions, I am constrained to find that it does not exceed the permissible range of state action limited by the Fourteenth Amendment. By way of emphasis I therefore add a few words to the dissent of Mr. Justice Harlan, in which I concur.

It is essential, at the outset, to establish what is not involved in this litigation:

(1) As the Court recognizes, this is not a case where, as in *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, and *Bates* v. *Little Rock,* 361. U. S. 516, a State, asserting the power to compel disclosure of organizational affiliations, can show no rational relation between disclosure and a governmental interest justifying it. Those cases are relevant here only because of their recognition that an interest in privacy, in non-disclosure, may under appropriate circumstances claim constitutional protection. The question here is whether that interest is overborne by a countervailing public interest. To this concrete, limited question—whether the State's interest in knowing the nature

of the organizational activities of teachers employed by it or by institutions which it supports, as a basis for appraising the fitness of those teachers for the positions which they hold, outweighs the interest recognized in *N. A. A. C. P.* and *Bates*—those earlier decisions themselves give no answer.

(2) The Court's holding that the Arkansas statute is unconstitutional does not, apparently, rest upon the threat that the information which it requires of teachers will be revealed to the public. In view of the opinion of the Supreme Court of Arkansas, decision here could not, I believe, turn on a claim that the teachers' affidavits will not remain confidential. That court has expressly said that "Inasmuch as the validity of the act depends upon its being construed as a *bona fide* legislative effort to provide school boards with needed information, it necessarily follows that the affidavits need not be opened to public inspection, for the permissible purpose of the statute is to enlighten the school board alone." 231 Ark. 641, 646, 331 S. W. 2d 701, 704. If the validity of the statute depended on this matter, the pronouncement of the State's highest judicial organ would have to be read as establishing—the earlier view of the State Attorney General notwithstanding—that the statute does not authorize the making public of the affidavits. Even were the Arkansas court's language far more ambiguous than it is, it would be our duty so to understand its opinion, in accordance with the principle that "So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed." *Fox* v. *Washington,* 236 U. S. 273, 277.

(3) This is not a case in which *Lovell* v. *Griffin,* 303 U. S. 444; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Saia* v. *New York,* 334 U. S. 558; and *Kunz* v. *New York,* 340 U. S. 290, call for condemnation of the "breadth" of the statute. Those decisions struck down licensing laws

. which vested in administrative officials a power of censorship over communications not confined within standards designed to curb the dangers of arbitrary or discriminatory official action. The "breadth" with which the cases were concerned was the breadth of unrestricted discretion left to a censor, which permitted him to make his own subjective opinions the practically unreviewable measure of permissible speech.[1] Nor is this a case of the nature of *Thornhill* v. *Alabama,* 310 U. S. 88, and *Herndon* v. *Lowry,* 301 U. S. 242,[2] involving penal statutes which the Court found impermissibly "broad" in quite another sense. Prohibiting, indiscriminately, activity within and without the sphere of the Fourteenth Amendment's protection of free expression, those statutes had the double vice of deterring the exercise of constitutional freedoms by making the uncertain line of the Amendment's application determinative of criminality and of prescribing indefinite standards of guilt, thereby allowing the potential vagaries and prejudices of juries, effectively insulated against control by reviewing courts, the power to intrude upon the protected sphere. The statute challenged in the present cases involves neither administrative discretion to censor nor vague, overreaching tests of criminal responsibility.

---

[1] See also *Hague* v. *C. I. O.,* 307 U. S. 496; *Schneider* v. *State,* 308 U. S. 147 (the Irvington ordinance); *Largent* v. *Texas,* 318 U. S. 418; *Jones* v. *Opelika,* 319 U. S. 103, vacating 316 U. S. 584 (the Opelika ordinance); *Niemotko* v. *Maryland,* 340 U. S. 268; *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495; *Gelling* v. *Texas,* 343 U. S. 960; *Superior Films, Inc.,* v. *Department of Education,* 346 ·U. S. 587; *Staub* v. *Baxley,* 355 U. S. 313; cf. *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517. The common-law count in the *Cantwell* case involved considerations similar to those which were determinative of the decisions cited in text and note, at note 2, *infra.*

[2] See also *Stromberg* v. *California,* 283 U. S. 359; *Winters* v. *New York,* 333 U. S. 507.

Where state assertions of authority are attacked as impermissibly restrictive upon thought, expression, or association, the existence *vel non* of other possible less restrictive means of achieving the object which the State seeks is, of course, a constitutionally relevant consideration. This is not because some novel, particular rule of law obtains in cases of this kind. Whenever the reasonableness and fairness of a measure are at issue—as they are in every case in which this Court must apply the standards of reason and fairness, with the appropriate scope to be given those concepts, in enforcing the Due Process Clause of the Fourteenth Amendment as a limitation upon state action—the availability or unavailability of alternative methods of proceeding is germane. Thus, a State may not prohibit the distribution of literature on its cities' streets as a means of preventing littering, when the same end might be achieved with only slightly greater inconvenience by applying the sanctions of the penal law not to the pamphleteer who distributes the paper but to the recipient who crumples it and throws it away. *Hague* v. *C. I. O.*, 307 U. S. 496; *Schneider* v. *State,* 308 U. S. 147; *Jamison* v. *Texas,* 318 U. S. 413. Nor may a State protect its population from the dangers and incitements of salacious books by restricting the reading matter of adults to that which would be harmless to the susceptible mind of a child. *Butler* v. *Michigan,* 352 U. S. 380. And see *De Jonge* v. *Oregon,* 299 U. S. 353; *Talley* v. *California,* 362 U. S. 60.[3] But the consideration

[3] Language characterizing state statutes as overly broad has sometimes been found in opinions where it was unnecessary to the result, and merely meant to express the idea that whatever state interest was there asserted as underlying a regulation was insufficient to justify the regulation's application to particular circumstances fairly within the Fourteenth Amendment's protection. Compare *Thomas* v. *Collins,* 323 U. S. 516, with *Fiske* v. *Kansas,* 274 U. S. 380. Compare *Martin* v. *Struthers,* 319 U. S. 141, with *Breard* v. *Alexandria,* 341 U. S. 622.

of feasible alternative modes of regulation in these cases did not imply that the Court might substitute its own choice among alternatives for that of a state legislature, or that the States were to be restricted to the "narrowest" workable means of accomplishing an end.  See *Prince* v. *Massachusetts,* 321 U. S. 158, 169–170.  Consideration of alternatives may focus the precise exercise of state legislative authority which is tested in this Court by the standard of reasonableness, but it does not alter or displace that standard.  The issue remains whether, in light of the particular kind of restriction upon individual liberty which a regulation entails, it is reasonable for a legislature to choose that form of regulation rather than others less restrictive.  To that determination, the range of judgment easily open to a legislature in considering the relative degrees of efficiency of alternative means in achieving the end it seeks is pertinent.

In the present case the Court strikes down an Arkansas statute requiring that teachers disclose to school officials all of their organizational relationships, on the ground that "Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness."  Granted that a given teacher's membership in the First-Street Congregation is, standing alone, of little relevance to what may rightly be expected of a teacher, is that membership equally irrelevant when it is discovered that the teacher is in fact a member of the First Street Congregation *and* the Second Street Congregation *and* the Third Street Congregation *and* the 4–H Club *and* the 3–H Club *and* half a dozen other groups?  Presumably, a teacher may have so many divers associations, so many divers commitments, that they consume his time and energy and interest at the expense of his work or even of his professional dedication.  Unlike wholly individual interests, organizational connections—because they involve obligations undertaken with relation to other per-

sons—may become inescapably demanding and distracting. Surely, a school board is entitled to inquire whether any of its teachers has placed himself, or is placing himself, in a condition where his work may suffer. Of course, the State might ask: "To how many organizations do you belong?" or "How much time do you expend at organizational activity?" But the answer to such questions could reasonably be regarded by a state legislature as insufficient, both because the veracity of the answer is more difficult to test, in cases where doubts as to veracity may arise, than in the case of the answers required by the Arkansas statute, and because an estimate of time presently spent in organizational activity reveals nothing as to the quality and nature of that activity, upon the basis of which, necessarily, judgment or prophesy of the extent of future involvement must be based. A teacher's answers to the questions which Arkansas asks, moreover, may serve the purpose of making known to school authorities persons who come into contact with the teacher in all of the phases of his activity in the community, and who can be questioned, if need be, concerning the teacher's conduct in matters which this Court can certainly not now say are lacking in any pertinence to professional fitness. It is difficult to understand how these particular ends could be achieved by asking "certain of [the State's] teachers about all their organizational relationships," or "all of its teachers about certain of their associational ties," or all of its teachers how many associations currently involve them, or during how many hours; and difficult, therefore, to appreciate why the Court deems unreasonable and forbids what Arkansas does ask.

If I dissent from the Court's disposition in these cases, it is not that I put a low value on academic freedom. See *Wieman* v. *Updegraff*, 344 U. S. 183, 194 (concurring opinion); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 255 (concurring opinion). It is because that very freedom,

in its most creative reaches, is dependent in no small part upon the careful and discriminating selection of teachers. This process of selection is an intricate affair, a matter of fine judgment, and if it is to be informed, it must be based upon a comprehensive range of information. I am unable to say, on the face of this statute, that Arkansas could not reasonably find that the information which the statute requires—and which may not be otherwise acquired than by asking the question which it asks— is germane to that selection. Nor, on this record, can I attribute to the State a purpose to employ the enactment as a device for the accomplishment of what is constitutionally forbidden. Of course, if the information gathered by the required affidavits is used to further a scheme of terminating the employment of teachers solely because of their membership in unpopular organizations, that use will run afoul of the Fourteenth Amendment. It will be time enough, if such use is made, to hold the application of the statute unconstitutional. See *Yick Wo* v. *Hopkins,* 118 U. S. 356. Because I do not find that the disclosure of teachers' associations to their school boards is, without more, such a restriction upon their liberty, or upon that of the community, as to overbalance the State's interest in asking the question, I would affirm the judgments below.

I am authorized to say that MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER agree with this opinion.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER, MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join, dissenting.

Of course this decision has a natural tendency to enlist support, involving as it does an unusual statute that touches constitutional rights whose protection in the context of the racial situation in various parts of the country

demands the unremitting vigilance of the courts. Yet that very circumstance also serves to remind of the restraints that attend constitutional adjudication. It must be emphasized that neither of these cases actually presents an issue of racial discrimination. The statute on its face applies to *all* Arkansas teachers irrespective of race, and there is no showing that it has been discriminatorily administered.

The issue is whether, consistently with the Fourteenth Amendment, a State may require teachers in its public schools or colleges to disclose, as a condition precedent to their initial or continued employment, all organizations to which they have belonged, paid dues, or contributed within the past five years. Since I believe that such a requirement cannot be said to transgress the constitutional limits of a State's conceded authority to determine the qualifications of those serving it as teachers, I am bound to consider that Arkansas had the right to pass the statute in question, and therefore conceive it my duty to dissent.

The legal framework in which the issue must be judged is clear. The rights of free speech and association embodied in the "liberty" assured against state action by the Fourteenth Amendment (see *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Gitlow* v. *New York,* 268 U. S. 652, 672, dissenting opinion of Holmes, J.) are not absolute. *Near* v. *Minnesota,* 283 U. S. 697, 708; *Whitney* v. *California,* 274 U. S. 357, 373 (concurring opinion of Brandeis, J.). Where official action is claimed to invade these rights, the controlling inquiry is whether such action is justifiable on the basis of a superior governmental interest to which such individual rights must yield. When the action complained of pertains to the realm of investigation, our inquiry has a double aspect: first, whether the investigation relates to a legitimate governmental purpose; second, whether, judged in the light of that purpose, the ques-

tioned action has substantial relevance thereto. See *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 360 U. S. 72.

In the two cases at hand, I think both factors are satisfied. It is surely indisputable that a State has the right to choose its teachers on the basis of fitness. And I think it equally clear, as the Court appears to recognize, that information about a teacher's associations may be useful to school authorities in determining the moral, professional, and social qualifications of the teacher, as well as in determining the type of service for which he will be best suited in the educational system. See *Adler* v. *Board of Education,* 342 U. S. 485; *Beilan* v. *Board of Public Education,* 357 U. S. 399; see also *Slochower* v. *Board of Education,* 350 U. S. 551. Furthermore, I take the Court to acknowledge that, agreeably to our previous decisions, the State may enquire into associations to the extent that the resulting information may be in aid of that legitimate purpose. These cases therefore do not present a situation such as we had in *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, and *Bates* v. *Little Rock,* 361 U. S. 516, where the required disclosure bears no substantial relevance to a legitimate state interest.

Despite these considerations this statute is stricken down because, in the Court's view, it is too broad, because it asks more than may be necessary to effectuate the State's legitimate interest. Such a statute, it is said, cannot justify the inhibition on freedom of association which so blanket an inquiry may entail. Cf. *N. A. A. C. P.* v. *Alabama, supra; Bates* v. *Little Rock, supra.*

I am unable to subscribe to this view because I believe it impossible to determine *a priori* the place where the line should be drawn between what would be permissible inquiry and overbroad inquiry in a situation like this. Certainly the Court does not point that place out. There can be little doubt that much of the associational informa-

tion called for by the statute will be of little or no use whatever to the school authorities, but I do not understand how those authorities can be expected to fix in advance the terms of their enquiry so that it will yield only relevant information.

I do not mean to say that alternatives such as an enquiry limited to the names of organizations of whose character the State is presently aware, or to a class of organizations defined by their purposes, would not be more consonant with a decent respect for the privacy of the teacher, nor that such alternatives would be utterly unworkable. I do see, however, that these alternatives suffer from deficiencies so obvious where a State is bent upon discovering everything which would be relevant to its proper purposes, that I cannot say that it must, as a matter of constitutional compulsion, adopt some such means instead of those which have been chosen here.

Finally, I need hardly say that if it turns out that this statute is abused, either by an unwarranted publicizing of the required associational disclosures or otherwise, we would have a different kind of case than those presently before us. See *Lassiter* v. *Northampton Elections Board,* 360 U. S. 45, 53–54. All that is now here is the validity of the statute on its face, and I am unable to agree that in this posture of things the enactment can be said to be unconstitutional.

I would affirm in both cases.