334 F.Supp. 358 (1971)
Wilmer K. CALVIN, Jr., Plaintiff,
v.
Roy RUPP, individually and in his capacity as Superintendent of Schools, Brookfield R-III School District, et al., Defendants.
No. N 69 C 15.
United States District Court, E. D. Missouri, N. D.
October 20, 1971.
Cook, Murphy, Lance & Mayer, St. Louis, Mo., Smith, Lewis & Rogers, Columbia, Mo., for plaintiff.
Walter E. Allen, Brookfield, Mo., Collins & Grimm, Macon, Mo., for defendants.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
Plaintiff, a school teacher, seeks injunctive and monetary relief on his claim that the refusal of the Brookfield R-III School District to reemploy him violated his federally protected rights of free speech and assembly. Our jurisdiction *359 is invoked under Sections 1343, 1331, and 2201, 28 U.S.C.
Plaintiff was employed for the 1968-1969 school year. He taught courses in English, School Publications, Speech and Dramatics, at the Brookfield High School.[1] Under then applicable Missouri law, Section 168.111 R.S.Mo. (since repealed and superseded by the Teacher Tenure Act effective July 1, 1970), each school board is required to "notify each teacher in writing concerning his reemployment or lack thereof on or before the fifteenth day of April in the year in which the contract then in force expires" and its failure to do so constitutes reemployment on the same terms as the existing contract. A teacher who is informed by written notice of his reemployment has fifteen days thereafter in which to accept the employment tendered, and if he fails to accept within the time prescribed he thereby rejects the board's offer. A majority vote of the whole board is required to approve reemployment.
At its regular meeting of March 11, 1969, the six defendant directors constituting the school board of the Brookfield R-III School District acting upon the recommendation of defendant Rupp, Superintendent of Schools, unanimously voted to reemploy all teachers under contract to the district who had not resigned, including plaintiff. Thereafter, individual "Teachers' Reemployment Notices", attested by the President of the Board and its Clerk were prepared and placed in the hands of Superintendent Rupp for delivery to the teachers. As appears infra, plaintiff left the school premises on the morning of March 18, 1969, and did not return until March 25th, having been out of the city in the interim. On March 25, at the conclusion of a meeting with Rupp, plaintiff asked if Rupp had a reemployment notice for him. Thereupon Rupp took the notice out of his pocket and handed it to plaintiff.
On the evening of April 1, 1969, following the school board election earlier that day an organizational meeting of the board was held during the course of which a resolution which had been prepared by Rupp earlier that day with the aid of counsel was presented to and unanimously adopted whereby the board rescinded its March 18, 1969 order respecting plaintiff's reemployment. Following this action, plaintiff was requested to appear before the Board. When he did so he was given a copy of the resolution and informed that he would not be reemployed.[2]
Basically, plaintiff contends that the failure of the board to rehire him was based (1) on his membership activities in the Community Teacher Association (CTA) and (2) on school administration-imposed censorship of the school newspaper, B-Liner, which interfered with plaintiff's constitutional right to teach journalism as he saw fit. We hold that the weight of the credible evidence does not substantiate plaintiff's claim in either respect.
The Community Teachers Association is a professional organization, the members of which are teachers in the Brookfield School District. Plaintiff belonged to this group. So, too, did defendants Rupp and Crow, the principal of Brookfield High School. The salary schedule in the Brookfield School District was a subject of concern to the CTA. It appointed a committee to seek higher salaries. Plaintiff was not a member of that committee nor did he hold any office in the association. A joint meeting of the school board and the CTA was held on January 30, 1969, at which various members of the CTA, including *360 plaintiff, expressed their individual views. In the course of plaintiff's remarks he used what was later described as "militant" language in that he complained of teachers being at the mercy of the public and said they ought to have the same bargaining rights as teamsters, apparently with the same right to strike. Other speakers more active than plaintiff in the CTA vigorously advocated a revised salary schedule. All these teachers were offered reemployment by the board.
We find that Crow's reservations which he expressed to Rupp about the employment of plaintiff were wholly unrelated to any matters involving the CTA. It was Rupp's feeling after talking to Crow that the problems affecting the relationship between plaintiff and Crow could be worked out, and on this premise, he recommended that the board act favorably as to plaintiff. And that is precisely what the board did on March 11, 1969. Of course, Rupp subsequently changed his mind about plaintiff, but that was so for reasons having nothing to do with plaintiff's CTA activities. In our judgment, neither Rupp's final recommendation of April 1, 1969 nor the action of the board that evening resulted in any degree from any of the activities of the CTA or plaintiff's participation therein.
Plaintiff's further claim that his constitutional rights were violated by reason of the school administration's alleged censorship of the school newspaper is equally without merit. As noted, plaintiff taught various courses one of which was School Publications, a course which plaintiff equated with journalism. He was not, however, certified to teach journalism nor had he had any formal training in journalism prior to the close of the 1968-1969 school year. It appears that as part of their studies in School Publications, the students did all aspects of the work entailed in getting out the school newspaper. Since the actual publication and distribution of the newspaper were not part of the services required of plaintiff in teaching School Publications, he was paid an additional sum of $200 for his extra-curricular services in connection therewith.[3] At the beginning of the school year, it was understood that eight issues of the B-Liner would be published, part of the cost to be recovered by advertising paid for on an 8-issue basis. The deficit was borne by the school district. Admittedly, only five issues were actually published, so that refunds to advertisers became necessary.
At its November 14, 1968, meeting the school board had adopted without change a dress code which had been recommended by the elected student council. This fact was not disclosed in the November 21 issue of the B-Liner. However, the following issue of December 19 contained at least six articles (including editorials) and a cartoon pertaining to the dress code. Rupp and Crow expressed the opinion to plaintiff that a disproportionate amount of attention had been given to this one subject, resulting in the omission of other matters of interest to the students. After the publication of the February 13 issue (which contained one article on the dress code), plaintiff met with Rupp and Crow and informed them that the issue to be published February 26 would contain matters relating both to the dress code and to the student council election. At that time, although plaintiff expressly afforded Rupp and Crow an opportunity to inspect and delete any such material if they chose to do so, they told him to go ahead and print the paper, and it was, without any interference on the part of defendants. Up to this point not even plaintiff claims that there was any actual threat of censorship. Work on the next edition of the B-Liner then *361 started, and the evidence shows that it could reasonably have been completed within 10 days or two weeks, but it was never published. Plaintiff alone willed it so. Background facts follow.
On March 12, 1969, plaintiff revealed to Rupp and Crow for the first time information and suspicions he had relating to the possible use and sale of marijuana by students of the Brookfield High School. Much of this information had been known to him for some time. Under school policy, of which plaintiff was admittedly aware, he should have immediately reported matters involving possible misconduct by students to the school administration for their evaluation and action. Instead of doing so, plaintiff contacted the Federal Narcotics Bureau in Kansas City shortly before a scheduled Thanksgiving, 1968 trip to Chicago with members of his School Publications class, and thereafter plaintiff conferred with a narcotics agent the Bureau had sent to the school, all this without the knowledge of the administration. In Chicago one of the students (M-R-) acted in a manner which led plaintiff to believe (but could not verify) that the student had been contacting a source of supply for marijuana. On the same trip, on the basis of circumstantial evidence, plaintiff suspected (but again could not definitively prove) that others of his students had been drinking. Additional information which plaintiff did not report until March 12, were (1) that a named student had told him on March 1 that M-R- was carrying marijuana cigarettes, (2) that since about that date a named student had been going to the darkroom with unusual frequency and had even asked plaintiff for a key to enter the darkroom at night, (3) that plaintiff had detected strange odors in the darkroom which he suspected were due to the smoking of marijuana, and (4) that he had found a note which indicated that its author had been selling marijuana at the school.
After plaintiff belatedly disclosed this information, at the same time demonstrating, in Rupp's opinion, that the school policy of immediate reporting suspected student misconduct had been violated by plaintiff, he was explicitly directed to say nothing further about the incident to anyone. It is to be reasonably inferred from the evidence, in violation of this directive, the matter was mentioned to one of the students. As a result, the boy's father came to the conclusion that his son had been accused of selling marijuana, telephoned plaintiff in a very belligerent fashion on the evening of March 17, 1969, and was referred by plaintiff to Rupp. The following morning, at Rupp's direction, plaintiff met with him in Rupp's office and was severely reprimanded for about ten minutes, after which plaintiff left the school reporting to Crow that he was ill. Before leaving, he carefully packed his personal belongings and told a student that he did not know whether he would return. He did, however, return, one week later, on March 25th.
In the interim, defendant Crow had heard from students that the next issue of the B-Liner would be a "hot" one, particularly as it related to marijuana. For that reason, Crow told plaintiff on March 25, without any expressed objections on plaintiff's part, that he (Crow) would like to see the next issue of the B-Liner before it was published. We resolve in favor of defendants the dispute in the evidence as to whether Crow also said that all future issues of the paper would have to be submitted to him for approval prior to going to press. It was during this March 25th conference that plaintiff was informed by Rupp and Crow that some of the time he had been devoting to his Publications class could and should be more profitably used for his English class, and plaintiff agreed to budget his time accordingly. Plaintiff was also told that since it appeared that there was insufficient time to get out all three remaining issues of the paper before the end of the school year, it would be sufficient if the one issue then in process of preparation be completed and then to complete one additional issue if *362 time permitted. Although plaintiff did not explicitly so state at the time, he unquestionably led Rupp and Crow to believe that the issue then in course of preparation would in fact be completed. However, the very next day, without prior consultation with either Crow or Rupp, plaintiff directed the students of his Publications class to stop all work on the newspaper, informing them there would be no further publication unless and until he gave the word, and no such word was ever given. We have no doubt that plaintiff had already determined in his own mind at least as of March 26 to discontinue publication of the B-Liner, although he had been paid for his supervisory services for the issues which had not been published. In our view, if plaintiff had any objections to Crow's request to see the next issue before publication, the time and place to have voiced such objection was when the request was made. Instead of doing so, plaintiff led his class to believe that plaintiff was protecting them against outside censorship, that is, censorship by others than plaintiff himself.
If censorship is in this case at all, plaintiff himself put it there by the most drastic form of censorship, namely the complete suppression of the newspaper. We do not believe that Crow's statement of his desire to see the next issue of the B-Liner before publication constituted censorship. After all, the paper was school-sponsored and school-subsidized and as a responsible administrator, Crow was justified in making his request in view of the "hot" issue rumor relating to marijuana.[4] As we see it, plaintiff's suppression of the school newspaper under the circumstances justified a finding of insubordination on his part. So, too, did his failure to comply with his obligation to promptly report the suspicious circumstances pertaining to the possible use of marijuana and drinking by students.
That plaintiff had been guilty of a number of infractions of the board's rules and policies prior to March 11 admits of no reasonable doubt. Inter alia, he was late in returning to classes on a number of occasions, and failed to enter grades as and when required. Nevertheless, plaintiff was initially offered reemployment, and that was done on the recommendation of defendant Rupp. On this premise, plaintiff argues that the members of the school board should be held precluded from taking into account any of plaintiff's deficiencies of which they were aware on March 11. A related argument is that any professed reliance by defendants on plaintiff's earlier deficiencies as additional support for the school board's April 1 decision should not be accepted as bonafide.
We do not agree. It is, of course, true that even as of April 1st the school board would not have rescinded the offer of reemployment but for the situation which became known to defendants subsequent to March 11th. However, the members of the board could not reasonably be expected to completely divorce from their minds plaintiff's known deficiencies when they were reappraising the desirability of rescinding the offer of reappointment in the light of the matters as to which they had no knowledge on March 11th.
The basic reasons for the rescission of the offer of reemployment were that plaintiff was guilty of undermining the school administration and of insubordination. These were based upon plaintiff's failure to immediately report suspected misconduct on the part of students, conducting his personal investigation instead of permitting the school authorities to do so, bringing a federal narcotics agent to the school campus without the knowledge of school authorities for the purpose of investigating possible marijuana violations, and deliberately refusing to permit his students to publish further issues of the school paper without justification and without consultation with the administration.
*363 Plaintiff argues that inasmuch as "every conceivable event or reason" for not reemploying him had been discussed by the administration and the majority of the school board members at an informal meeting held on March 17,[5] and that with such knowledge on March 26, Rupp, as agent of the board had given plaintiff the March 11th reemployment notice, it necessarily follows that nothing which occurred prior to March 25th could have been the real reason for the board's April 1st action. Under the circumstances, we do not believe this argument to be valid.
The school board had acted officially on March 11 to offer reemployment to plaintiff, and no meeting of the board was held thereafter until April 1. Even at the informal meeting which Rupp held with four members of the board, nothing was said respecting the outstanding offer of reemployment or whether such offer should be held in abeyance pending further consideration by the board. There is not the slightest evidence that the board members then knew that Rupp had not delivered the reemployment notice to plaintiff nor that any decision, even an informal one, was made on March 17 to reemploy plaintiff, as he now argues. Whatever Rupp's personal feelings may have been as a result of the disclosures of March 12th, the fact is that as a ministerial officer acting solely under authority of the board, he could not have legitimately refused to give plaintiff the notice of reemployment when plaintiff specifically requested it on March 25th, even if the possibility of rescission had then occurred to him. Had plaintiff accepted the offer prior to April 1, that would have been the end of the matter.[6]
Plaintiff does not question the right of the school board under the then applicable Missouri law not to rehire a teacher if the decision not to offer reemployment is not based in whole or in part upon constitutionally impermissible reasons. Defendants accept this view of the law, which is in accord with controlling decisions. See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 and Freeman v. Gould Special School District of Lincoln County, 8 Cir., 405 F.2d 1153, 1158; and cf. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.
On the basis of the credible evidence, we find that the school board's action of April 1, 1971 in refusing to renew plaintiff's teaching contract was based on his violation of the school board's policy in that he failed to immediately report suspicious matters relating to conduct of students, on his responsibility for initiating an investigation, without the knowledge or authority of the board, by a federal narcotics agent, as well as on his action in unjustifiably directing his class to cease publication of the school newspaper. The board was warranted in concluding that plaintiff's conduct constituted insubordination *364 and undermining the authority of the school administration, and that such conduct, when considered with the known deficiencies on plaintiff's part, justified his non-retention. As held supra, on a consideration of the evidence as a whole (including evidence as to which objections were sustained or rulings deferred) we find against plaintiff on his claim that he was not reemployed for the reasons, at least in part, that he was active in the CTA and that he refused to submit to censorship of the school paper which would interfere with his First Amendment rights as a teacher. The contention that plaintiff's non-retention as a teacher violated his right to free speech and association is unsupported by the credible evidence.
Plaintiff further urges that he was denied procedural due process by the failure of the board to accord him a hearing at which he could present evidence respecting any specific reasons for his non-retention had they been furnished him. We deny this contention on the basis of Freeman v. Gould Special School District of Lincoln County, 8 Cir., 405 F.2d 1153. We note that Judge Lay dissented in that case, but the dissent was based on his view that plaintiffs had sustained their burden of proof of demonstrating that their non-retention was based on impermissible grounds and that the decision not to reemploy plaintiffs was arbitrarily made without basis in fact. In the instant case, it can not reasonably be claimed that the decision to rescind the offer of reemployment was arbitrary or that the board could not reasonably have determined that plaintiff should not be reemployed. It follows from the facts as we have found them that plaintiff was not denied any right to substantive due process.
The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.
NOTES
[1] He had previously taught in defendants' school district, without incident as far as the record shows, from 1959 to 1961 and from 1963 to 1967.
[2] The following day, on advice of his counsel, plaintiff wrote a letter to Rupp and the board purporting to accept the March 11th offer of reemployment. The present action was not, however, brought to recover for simple breach of contract on the assumption that the board could not rescind its offer before acceptance. Our jurisdiction is based solely on the alleged violation of plaintiff's civil rights.
[3] A comparable extra-curricular activity for which he was to be paid another $200 was putting on the senior class play in conjunction with the drama course he taught. For reasons which are not spelled out of record, plaintiff did not put on the play, so that he did not receive this additional compensation.
[4] Plaintiff took it upon himself to destroy the partially completed issue, thereby making it impossible to verify the factual basis for the rumor.
[5] Plaintiff overlooks in this connection his action in directing his class to stop work on the school paper because of alleged administration censorship, an "event" which did not happen and could not have been known prior to March 26.
[6] The evidence leaves in some doubt whether plaintiff would have accepted the offer had it not been rescinded. During the week following his departure from school on March 18, plaintiff visited friends in several communities, including educators in the field of journalism to whom he unburdened himself of his complaints respecting his treatment at Brookfield, and as a result of one of these visits, plaintiff was forwarded an application for a teaching position in the Springfield school district and he filled out this application under date of April 1. Subsequent to the events here at issue, plaintiff was employed to teach in Springfield upon his assurance that he would honor a contract for the ensuing school year if it were tendered to him. He testified that he believed that he was overworked both at Brookfield and during the year he was employed in Springfield, and for that reason, among others, resigned to devote full time to the ministry. At the trial he testified that he did not know whether he would accept reemployment if it were now offered.