CITY OF COLUMBUS, Appellee,

v.

**KASPER, Appellant.**

[Cite as *Columbus v. Kasper* (1989), 61 Ohio App.3d 776.]

Court of Appeals of Ohio,
Franklin County.

No. 88AP–606.

Decided April 20, 1989.

*Ronald J. O'Brien*, City Attorney, *James J. Fais*, City Prosecutor, and *Thomas K. Lindsey*, for appellee.

*Eric R. Nordman*, for appellant.

WHITESIDE, Judge.

Defendant-appellant, John Kasper, appeals his conviction in the Franklin County Municipal Court of violating an ordinance pertaining to use of sound-amplification equipment and raises the following assignments of error:

"I. The trial court erred by convicting defendant-appellant for violation of City Code Section 531.10 which section is impermissibly vague, in violation of defendant-appellant's constitutional rights.

"II. The trial court erred by convicting defendant-appellant for violation of City Code Section 531.10 which is overbroad, in violation of defendant-appellant's constitutional rights.

"III. The trial court erred in convicting defendant-appellant under Columbus City Code Section 531.10 which violates his rights to freedom of speech and equal protection under both the United States and Ohio Constitutions.

"IV. The court erred in admitting the testimony of the city's witness as to certain alleged facts without establishing a foundation that said facts were within the witness' personal knowledge, and in admitting certain other irrelevant testimony.

"V. The trial court erred in failing to exclude certain evidence, therein denying defendant-appellant a fair trial in violation of defendant-appellant's due process rights.

"VI. The court denied defendant-appellant's right to compulsory process in violation of his 5th and 14th Amendment rights under the U.S. Constitution and under Article I, Section 10, of the Ohio Constitution."

Defendant was among a group of protestors at the Northwest Women's Center, an abortion clinic, where he was playing a tape player. Officer Joel White, who was on special duty at the clinic, asked defendant to turn down the volume on his tape player. White testified that he was on the fourth floor of

the building, and he could hear the tape player faintly. When defendant refused to turn down the tape player, White confiscated it and issued defendant a citation, pursuant to Columbus City Codes ("C.C.") 531.10, which reads:

"The operation of sound amplification equipment for the purpose of the amplification of any noncommercial speech, address, announcement or music to persons lawfully assembled as voluntary listeners thereto shall be permitted, but no person shall operate or cause to be operated any sound amplification equipment, the sound from which is plainly audible to persons on the streets or public grounds, without controlling the volume of sound so as not to be greater than reasonably required to be plainly audible throughout the area of such lawful voluntary assemblage."

At trial, Officer White testified that the volume of the tape player was between eight and nine on a scale of one to ten, with ten being the maximum volume. The city asked to play the tape player at that volume in the courtroom, and the court then permitted the tape player to be played at a volume level of eight and one-half to nine.

After all of the testimony and evidence was presented, the trial court found the defendant guilty of violating C.C. 531.10, the anti-noise ordinance. The trial court considered the defendant's First Amendment rights, but stated that they were not absolute. It also refused to find C.C. 531.10 unconstitutional. No issue with respect to any power of the city to regulate or license the use of sound-amplification equipment in public places is involved; rather, the ordinance in question specifically permits the use of sound-amplification equipment for noncommercial purposes.

■ By the first and second assignments of error, defendant attacks the constitutionality of C.C. 531.10, contending that it is both overbroad and vague. The city contends that defendant did not raise the issue of overbreadth in the lower court and, therefore, that issue is not properly before this court. Although defendant did not specifically mention "overbroad," he sufficiently raised the issue of overbreadth by the following statement regarding the ordinance:

"I think the statute itself is probably unconstitutionally vague, because if you're talking about something unconstitutionally vague, on the one hand, unreasonably loud could mean shattering windows. I don't think there's any disagreement about that. On the other hand, we could have it at such a low volume that everybody would agree that it isn't unreasonably loud. But there is a wide area in there, somebody's personal opinion or whatever else."

Defendant's first and second assignments of error will be discussed together since the doctrines of vagueness and overbreadth are closely interrelated concepts in the area of First Amendment protections. An overbroad statute is one which punishes activities that are not constitutionally protected, but also includes within its scope some activities which are protected by the First Amendment. Vagueness, on the other hand, although not limited to First Amendment protections, relates to the clarity of the statute and the "chilling effect" of an imprecise statute which offers insufficient guidelines by which to measure one's conduct.

The Supreme Court held in *Kolender v. Lawson* (1983), 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909, that, in order for a statute or ordinance to survive an attack of vagueness, it must " * * * define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. * * * "

If "ordinary people" must guess at the meaning of a statute, then they will possibly be deterred from conduct which is otherwise protected. This result is impermissible in the area of First Amendment freedoms.

Furthermore, the concepts of vagueness and overbreadth were well explained in *N.A.A.C.P. v. Button* (1963), 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418:

" * * * The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, *but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.* * * * These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. * * * " (Citations omitted and emphasis added.)

For this reason, whenever a statute or ordinance attempts to regulate speech, it must be narrowly tailored to reach only unprotected speech. In *Shelton v. Tucker* (1960), 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237, the court held:

" * * * In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. *The breadth of legislative abridgment*

*must be viewed in the light of less drastic means for achieving the same basic purpose."* (Emphasis added.)

Thus, the test is whether the statute is narrowly tailored to serve a substantial, legitimate governmental purpose.

■ Having the appropriate standards before us, we turn to examining the constitutionality of C.C. 531.10 in light of these standards. The phrase in that ordinance which defendant contends to be unconstitutional reads as follows:

" * * * [B]ut no person shall operate or cause to be operated any sound amplification equipment, the sound from which is plainly audible to persons on the streets or public grounds, *without controlling the volume of sound so as not to be greater than reasonably required to be plainly audible throughout the area of such lawful voluntary assemblage."* (Emphasis added.)

The language "greater than reasonably required," as read in its most broad sense, is not sufficiently definite so that ordinary people can understand at what volume level the sound-amplification device contravenes the ordinance. The range of volume which could be considered "reasonably required" is so broad that it is not apparent from the language at what level it becomes illegal.

Furthermore, if the purpose of the statute be to protect others from being subjected to unreasonably loud speeches or music to which they do not desire to listen, the ordinance is both overinclusive and underinclusive. While that purpose may be in the public interest, the ordinance is not narrowly tailored to serve that purpose. It is possible for the volume which is permitted by the ordinance as "reasonably required" to be so loud, annoying, or offensive as to be unreasonable to the unwilling listener. In that sense, the ordinance is underinclusive.

On the other hand, the ordinance is also overbroad. The meaning of the phrase "reasonably required" is elusive and depends not upon a definite objective standard but, instead, upon the nature and size of the assemblage irrespective of the effect upon the unwilling listener. Thus, what is "reasonably required" depends upon who are willing listeners and varies with their nature and desire, as well as their ability to hear. Thus, we are not given a single standard for application of the ordinance but, instead, a variable standard related not to the alleged public interest to be served but to the person involved in creating the sounds.

Clearly, the volume of the sound "reasonably required" varies with both the type of sound and the type of person involved. Rock music, whose volume is clearly "reasonably required" for the enjoyment of a teenage listener, may well be unreasonably loud to an unwilling adult listener some distance away.

On the other hand, volume of a speech to an assemblage of only a few persons may be louder than "reasonably required" for them to listen but, at the same time, not be unreasonably loud (or offensive) to the unwilling listener a short distance away. This varying application can lead to arbitrary and discriminative enforcement.

Although not directly argued, vagueness of other language of the ordinance compounds the vagueness of the sound level ordinance. The level of sound does not pertain to a level, volume, or intensity which unreasonably intrudes upon the rights of others who should not be compelled to listen to that which they do not wish to hear but, instead, should be able to carry on their own personal life and business without such interference. Rather, the sound level is restricted to that reasonably required to be *"plainly audible* throughout the area of such *lawful voluntary assemblage."* (Emphasis added.)

Even assuming that the words "plainly audible" are sufficiently definite, the words "lawful voluntary assemblage" are not sufficiently definite when read in context. The ordinance "permits" the use of sound-amplification equipment for noncommercial purposes but only to "persons lawfully assembled as voluntary listeners." If this be construed literally, the ordinance would be facially unconstitutional because it restricts the freedom of speech to communicate to those who in advance have agreed to listen. One of the important aspects of freedom of speech is the ability to be free to attempt to communicate to persons with whom the speaker is unacquainted in order to convince them of the speaker's proposition. The freedom of speech is not limited, as the ordinance implies, to communications between persons of like mind and opinion.

Even if given a broad construction, this portion of the ordinance requires that the listener be "lawfully assembled" whatever that may be intended to mean. Presumably, any assemblage is lawful unless some valid law or ordinance be violated by the assemblage itself. Next, sound must be directed only to "voluntary listeners." The very purpose of political speech is destroyed if one be restricted to communicating only to those who want to hear what is said. It is the communications to persons of indifference in an attempt to convince them to be concerned that perhaps is the most important purpose of protected political speech. Communications to persons of conflicting opinions in an attempt to persuade them to change is also protected speech so long as unwilling listeners are not forced to listen.

Without limiting construction, facially the ordinance purports to permit sound amplification of noncommercial speech only if it is directed to persons no matter how large in number who are assembled together for the purpose of listening to such speech. Then, no matter how offensive the sound level

may be to the unwilling ear, it is permitted so long as it is reasonably necessary to be plainly audible to all in the assemblage. Such a limitation pertains not to protecting the rights of the public but solely to limiting noncommercial speech.

The evidence admitted at trial was inconclusive. It established nothing regarding the loudness of the tape player in relation to the surrounding environment where it was played. Officer White, who was on duty on the fourth floor of the building, testified that he " * * * heard it from the fourth floor *faintly.*" (Emphasis added.) He also testified that, when he got outside, " * * * it was very loud, could be heard inside the building, other clients in the building, could be heard by people out on the street [*sic* ]." However, when asked on cross-examination whether anybody had complained on this particular morning about the tape player, White replied, "No." Rather, he testified that, although there were other people going in and out of the building, none of them had complained. Thus, even if the tape player could be heard by other people, none complained to the uniformed police officer on duty at the time.

White also testified that the tape player was at a volume level of approximately eight on a scale of one to ten. Without more, such as taking into consideration the surrounding environment where defendant was playing the tape player, *i.e.*, on a busy street corner, a mere volume level alone is not sufficient to support a conclusion that it was either "unreasonably" loud or louder than "reasonably required."

Considering the evidence in a light favorable to the city, it was insufficient to support a conviction under *any* interpretation of C.C. 531.10. Such evidence would not permit reasonable minds to find, beyond a reasonable doubt, that the ordinance was violated even assuming it be sufficient to establish probable cause.

If the ordinance be read in the most broad sense in accordance with its language, it is unconstitutionally vague and overbroad. Even if the ordinance be given a very narrow interpretation, read to mean that the volume of a sound-amplification device cannot be unreasonably loud, defendant's actions could not be reasonably found to constitute a violation beyond a reasonable doubt. Even if the ordinance could be narrowly construed not to be facially unconstitutional, as applied to the facts of this case, the ordinance is patently unconstitutional. Accordingly, the first and second assignments of error are well-taken.

██ By the third assignment of error, defendant contends that he was denied equal protection of the law. The city contends that defendant did not raise the issue in the lower court and, therefore, should be precluded from

raising it now. However inartfully it was done, defendant did raise an issue of discriminatory treatment, which is an equal-protection argument. In a preliminary hearing involving several subpoenas issued by the defendant, defendant made the following statement:

"Your Honor, the reason I'm asking for this is to establish whether this provision of the City Code is *being enforced against me arbitrarily;* and in order to do that, I would need to have that, to have those records * * *." (Emphasis added.)

■ Even though the equal-protection issue was raised, the trial court did not address the issue. The trial court merely held that " * * * the restraints placed on [defendant's right to free speech] by virtue of the Columbus City Codes are reasonable, not in violation of [defendant's] constitutional rights * * *." Since the record is devoid of *any* evidence which would indicate that defendant was in violation of that ordinance, even when interpreted in the most narrow sense, any error in failing to find that defendant was denied equal protection is not prejudicial. Any evidence of discriminatory enforcement would be unnecessary. Accordingly, the third assignment of error is not well-taken.

By the fourth assignment of error, defendant contends that the trial court improperly allowed questions which were outside the personal knowledge of the witness. These questions center around White's testimony which defendant now contends to be improper but to which he did not object to at trial. Defendant, in his reply brief, relies upon the concept of plain error contained in Crim.R. 52(B), which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

There is no plain error here, as the result of the trial would not have been different but for the alleged improper questions. Again, as we have already held, C.C. 531.10 is unconstitutional as applied to defendant's circumstance. The questions asked of White did not prejudice defendant and did not prove a violation of the ordinance. Accordingly, defendant's fourth assignment of error is not well-taken.

By the sixth assignment of error, defendant contends that the trial court erred in quashing several subpoenas that defendant asserts were essential to his defense. The subpoenas were directed at certain individuals in the police department and numerous records involving violations of C.C. 531.10. As with the equal-protection argument and the alleged improper questions posed to White, defendant was not prejudiced by the quashing of these subpoenas. Defendant did not need to prepare a better defense as there was not even a preponderance of the evidence, much less evidence beyond a reasonable doubt,

to support a conviction.  Accordingly, as defendant was not prejudiced by the quashing of the subpoenas, the sixth assignment of error is not well-taken.

By the fifth assignment of error, defendant contends it was an error for the trial court to allow the tape player to be played in the quiet courtroom at the same volume as it was played on the busy street corner.

The trial court, over defendant's objection, played the tape player at a volume of approximately eight on a scale of one to ten.  Although in-court experiments are permitted, they are governed by the syllabus rule of *St. Paul Fire & Marine Ins. Co. v. Baltimore & Ohio RR. Co.* (1935), 129 Ohio St. 401, 2 O.O. 396, 195 N.E. 861:

"1.  Evidence of experiments performed out of court, tending to prove or disprove a contention in issue, is admissible if there is a substantial similarity between conditions existing when the experiments are made and those existing at the time of the occurrence in dispute; dissimilarities, when not so marked as to confuse and mislead the jury, go to the weight rather than the admissibility of the evidence."

In other words, the surrounding conditions must be the same for the experiment as they were for the initial occurrence.

The only similarity between the courtroom playing of the tape player and defendant's playing of it on the day in question was the alleged volume level on the tape-player indicator.  When defendant played the tape player at the abortion clinic, he was outside in the open.  When the tape player was played in the courtroom at the same level, it was played in a confined area with the necessarily resultant reverberation against the courtroom walls and ceiling.  It is a matter of common knowledge that sound of the same intensity seems much louder in a closed space than it does outside because of the reverberation acting similar to an echo chamber.  A completely dissimilar atmosphere is involved in the playing of the tape player in the courtroom at the same volume level as it was played outside.  The courtroom playing is not probative of how the player sounded outside at the scene and much less how it sounded inside the building where White was.

Furthermore, the evidence was undisputed that the abortion clinic is located on a busy corner where there is a significant amount of traffic and, consequently, traffic noise.  There was presumably no such noise in the courtroom.  Taking all of these circumstances into account, any possible scant probative value of this evidence was substantially outweighed and overwhelmed by its prejudicial nature.  See Evid.R. 403(A).  Accordingly, the tape player should not have been played in the courtroom at the same volume level.  Defendant's fifth assignment of error is well-taken.

For the foregoing reasons, the first, second, and fifth assignments of error are sustained, while the third, fourth, and sixth assignments of error are overruled, the judgment of the Franklin County Municipal Court is reversed, and this cause is remanded to that court with instructions to dismiss the charges against defendant.

*Judgment reversed and cause remanded with instructions.*

BOWMAN and BURKHART, JJ., concur.

GEORGE F. BURKHART, J., of the Court of Common Pleas of Monroe County, sitting by assignment.