746 F.2d 728
 James R. SABEL, Webster B. Brooks, Robert Hill and Jeffrey
A. Rooney, Petitioners-Appellants,
v.
Leroy N. STYNCHCOMBE, Sheriff of Fulton County, Georgia, and
Sanford Jones, Clerk of the State Court of Fulton
County, Respondents-Appellees.
 No. 84-8092.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 13, 1984.
Rehearing and Rehearing En Banc Denied Dec. 19, 1984.
 
 Torin D. Togut, Decatur, Ga., for petitioners-appellants.
 E. Duane Cooper, Asst. Sol., Atlanta, Ga., for respondents-appellees.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before FAY and JOHNSON, Circuit Judges, and YOUNG*, District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 Appellants, members of the Revolutionary Communist Party, were convicted of violating Georgia's Refusal to Disperse Statute, O.C.G.A. Sec. 16-10-30,[1] during a political demonstration held at Bowen Homes Apartments on April 22, 1981. When their convictions were affirmed by the Georgia Supreme Court, Sabel v. State, 250 Ga. 640, 300 S.E.2d 663 (1983), appellants sought a writ of habeas corpus, challenging the constitutionality of O.C.G.A. Sec. 16-10-30. This petition was denied by the United States District Court for the Northern District of Georgia, Atlanta Division. Because we find that the application of this statute to appellants violated their First and Fourteenth Amendment rights, we reverse.
 
 I. FACTUAL BACKGROUND
 
 2
 During the spring of 1981, members of the Revolutionary Communist Party began to speak, disseminate information and organize political discussions at Bowen Homes Apartments in Fulton County, Georgia. Though Party members were able to involve some residents in their activities, they generated little interest and considerable hostility among many residents of the complex. Some resented the aggressive behavior of the Communists: Party members stepped on their grass, solicited the help of their children in distributing signs and literature, and sometimes refused to leave their apartments during door-to-door solicitations.[2] Others took exception to the Party members' political philosophy, feeling, as one witness testified, that "we don't need Communism in our country".
 
 
 3
 On April 22, 1981, six members of the Party, including appellants, gathered at Bowen Homes to speak with residents about plans for the upcoming May Day demonstration. On this occasion, appellants participated in their usual range of activities: they distributed literature and red flags, spoke to groups of residents (at times using a bullhorn) and engaged in door-to-door solicitation. At one point during the afternoon, one appellant and a fellow Party worker refused to leave the doorway of a Mrs. Bailey after being told that she was not interested in the Party or its literature.
 
 
 4
 Soon after this incident a crowd of residents began to gather on a sidewalk next to the parking lot where appellants were speaking. As more people arrived, the gathering became increasingly hostile to appellants. Some residents complained that "the lady that was with them would not get off of Mrs. Bailey's apartment"; others "were upset at some of the things the revolutionary workers were saying" and at the workers' failure to understand that "the Bowen Homes community is not interested in what they have to offer". Before long the group swelled to almost 200, and residents were "shouting", "shoving" and "cursing". An unidentified resident called the Fulton County Police.
 
 
 5
 Officers Britt and Kelly were the first to arrive on the scene. They found an angry crowd, a few residents attempting to take the bullhorn and red flags from appellants, others shouting "if you don't get them out, police, we will". Fearing that "we were going to have a riot," the officers called the remainder of their sector[3] to Bowen Homes and began efforts to disperse the crowd.
 
 
 6
 When a general request proved unavailing, the officers attempted to address appellants. Officer Britt approached each one in turn, asking him to leave the area immediately. Officer Kelly approached appellant Hill, who was struggling with a resident over his bullhorn, and told appellant Hill that he would "kick [his] ass if he didn't get out of there". When appellants failed to respond in any way to these requests, officers arrested them, led them by the arm to the waiting squad cars and drove them from the scene of the demonstration.
 
 II. THE CONSTITUTIONALITY OF Sec. 16-10-30
 
 7
 Appellants claim that Sec. 16-10-30, as applied to them under these circumstances, violated their right to freedom of speech, freedom of association and freedom to petition the government for redress of grievances, as guaranteed by the First and Fourteenth Amendments. The district court, citing the "aggressive and rude behavior" of appellants, held that the state had a sufficiently strong interest in averting imminent violence to justify infringing appellants' speech. We cannot agree.
 
 
 8
 While appellants may have been abrasive in communicating this message, this does not deprive their conduct at the demonstration on April 22 of its character as speech, deserving of the fullest constitutional protection. See Tinker v. Des Moines School Dist., 393 U.S. 503, 508-09, 89 S.Ct. 733, 737-38, 21 L.Ed.2d 731 (1969). To interfere with such protected conduct, the state must satisfy a heavy burden: it must not only demonstrate a substantial interest in regulating the speech in question, but it must show that the statute under which it regulates such conduct "does not broadly stifle fundamental liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).
 
 
 9
 Our review of the record casts doubt on the conclusion that police had a sufficient interest in preventing imminent violence to justify restricting appellants' speech.[4] None of those present testified to any violent acts by either residents or Party members; the only physical contact between the two groups occurred when residents sought to take the bullhorn and red flags from appellants. More importantly, the "shouting", "shoving" and "cursing" described by witnesses were virtually indistinguishable from the "unruly" and threatening behavior attributed to spectators in cases such as Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1968), in which the Court held that such danger provided an insufficient basis for governmental restriction of protected speech.[5]
 
 
 10
 Even if such interest had been sufficient, however, the state failed to demonstrate that it selected a suitably narrow means of achieving it. By prosecuting appellants under the Refusal to Disperse statute, a law designed to facilitate police response during fires and criminal investigations, the state foreclosed the use of other means which would have responded more directly to any illegal conduct without giving officials discretion to focus enforcement efforts on those engaged in speech. If state officials had agreed with some residents that the source of the problem was the aggressive behavior of appellants, they could have arrested appellant Hill for trespassing on Mrs. Bailey's property, or arrested all appellants for reckless conduct in trampling residents' newly planted grass. If police believed, as they stated[6], that they were less concerned with appellants' intrusions than with protecting them from an increasingly threatening crowd, they enjoyed an even greater range of choice. They could have taken steps to protect appellants while allowing the demonstration to continue, such as surrounding the speakers or arresting those spectators who threatened violence.[7] Or they could have taken Party members into temporary protective custody, curtailing the demonstration but not subjecting appellants to prosecution. Instead, after attempting only voluntary appeals, police arrested appellants and charged them under a statute intended for a different purpose. The application of Sec. 16-10-30 in these circumstances cannot be described as appropriately narrow, "in light of less drastic means for achieving the same purpose." Shelton v. Tucker, supra, at 488, 81 S.Ct. at 252.
 
 
 11
 In so holding we do not endorse the conduct of appellants. The record shows that they were abrasive in dealing with Bowen Homes residents and unresponsive to what began as reasonable law enforcement efforts. But the protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others. The application of Sec. 16-10-30 to appellants was unconstitutional.
 
 
 12
 REVERSED.
 
 GEORGE C. YOUNG, District Judge, dissenting:
 
 13
 In my opinion, the Georgia courts and the district court below correctly found that the hostility toward petitioners among Bowen Homes residents which erupted in the incidents of April 22, 1981 was generated principally by petitioners' abrasive and abusive behavior toward the residents, their children and their property, rather than by the political beliefs which petitioners espoused. Accordingly, since the emergency situation perceived by police officers at the scene was provoked by petitioners' unprotected conduct, rather than their protected speech, I believe the exacting scrutiny employed by the majority is an inappropriate standard of constitutional review in this case. See United States v. O'Brian, 391 U.S. 367, 376-377, 88 S.Ct. 1673, 1678-1679, 20 L.Ed.2d 672 (1968). Furthermore, I am satisfied that the officers properly appraised the situation as presenting a clear and present danger of unmanageable disorder and violence. It seems unrealistic in a situation such as this to prohibit police intervention prior to the occurrence of serious acts of violence, as the majority seems to suggest (Ante, pp. 730-731). See Washington Mobilization Committee v. Cullinane, 566 F.2d 107, 120 (D.C.Cir.1977).
 
 
 14
 The majority stresses that the angry reactions of the residents toward petitioners were virtually indistinguishable from the reactions of spectators in cases such as Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1968), in which "the Court held that such danger provided an insufficient basis for governmental restriction of protected speech." (Ante, p. 731). Those cases, however, are clearly distinguishable. Cox involved a civil rights demonstration in which a group of negro students marched to the courthouse in Baton Rouge, Louisiana where they assembled across the street to protest segregation and the arrest and imprisonment of fellow demonstrators. The defendants were arrested and convicted, not for refusing to obey an order to disperse, but for disturbing the peace. In holding that this action violated the defendants' First Amendment rights, the Supreme Court specifically found that there was "no indication that the mood of the students was ever hostile, aggressive, or unfriendly", and that the entire meeting from the beginning until its dispersal by teargas was "orderly and not riotous." 379 U.S. at 547, 85 S.Ct. at 460. The Court also rejected the contention that the convictions were justified because of fear of violence among spectators, noting that the reactions of white citizens were not violent, and were restricted to small groups totaling between 100 and 300. Significantly, those individuals were separated from the demonstrators by 75 to 80 armed policemen who clearly could have handled the crowd. Id. at 550, 85 S.Ct. at 462.
 
 
 15
 The majority particularly emphasizes the similarities between the instant facts and those in Gregory v. City of Chicago, supra. (Ante, p. 731 n. 5). In Gregory, police concern over impending civil disorder resulting from the unruly reactions among spectators to a civil rights demonstration led police to demand that the demonstrators, upon pain of arrest, disperse. Although the protesters were arrested when the command was not obeyed, they were charged and convicted for disorderly conduct. In reversing their convictions, the Supreme Court emphasized that there was no evidence that the demonstrators' conduct was disorderly. Most importantly, the Court also rejected the theory that the demonstrators were convicted not for the manner in which they conducted their march but rather for their refusal to disperse when requested to do so by the police. As the Court noted,
 
 
 16
 "However reasonable the police request may have been and however laudable the police motives, petitioners were charged and convicted for holding a demonstration, not for refusal to obey a police order.*
 
 
 17
 Also in contrast with the situations in Cox and Gregory is the fact that petitioners in this case never applied for a permit to assemble or gave police or municipal officials any advance warning of their activities in Bowen Homes. When petitioners' aggressive and inconsiderate behavior produced an agitated, angry crowd of about 200 residents, only a handful of police officers were available to attempt to maintain order. Petitioners were arrested only after the officers on hand reasonably determined that they could not adequately protect petitioners under the circumstances, and after petitioners refused to heed numerous police requests to disperse. As distinguished from Cox and especially Gregory, petitioners were prosecuted specifically for their refusal to obey such reasonable requests to disperse.
 
 
 18
 The majority holds that the state failed to prove that it achieved its interest in preventing imminent violence by suitably narrow means. Remarking that the statute under which petitioners were charged was "designed to facilitate police response during fires and criminal investigations", the Court suggests that petitioners could have been arrested rather for trespassing or reckless conduct. The question of whether O.C.G.A. Sec. 16-10-30 was intended to encompass incidents such as the one involved here is, of course, a question of Georgia law. Because the Georgia Supreme Court has concluded that Sec. 16-10-30 was properly applicable under the circumstances of this case, Sabel v. State, 250 Ga. 640, 300 S.E.2d 663 (1983), it seems inappropriate for this Court now to impose its view that the statute was "intended for a different purpose." (Ante, p. 731). Accordingly, I find it immaterial that petitioners arguably could have been charged for other infractions. The majority suggests that the officers, alternatively, should have taken the petitioners into temporary protective custody without subjecting them to prosecution. Given the emergency situation confronting the officers, which was provoked by petitioners' conduct, and the fact that petitioners refused to comply with repeated police requests that they disperse[1], I would not hold that prosecution of petitioners under Sec. 16-10-30 was beyond the valid police power of the State of Georgia. As the Supreme Court stated in Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940):
 
 
 19
 "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat of public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." (emphasis added).
 
 
 20
 Because none of the other grounds raised by petitioners merit reversal of the district court, I respectfully dissent.
 
 
 
 *
 Honorable George C. Young, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 O.C.G.A. Sec. 16-10-30 states:
 A person in a gathering who refuses to obey the reasonable official request or order of a peace officer or fireman to move, for the purpose of promoting public safety by dispersing those gathered in dangerous proximity to a fire or other emergency is guilty of a misdemeanor.
 
 
 [2]
 Party members would generally conduct their solicitation from the doorway of a resident's apartment; and, in some cases, when a resident would attempt to close the door, the Party member would "put the arm on the screen door" or "put their foot in the screen door"
 
 
 [3]
 A total of nine officers, including the sector supervisor, arrived at Bowen Homes in response to Officer Britt's request
 
 
 [4]
 Because a claim of constitutionally protected right is involved, it "remains our duty in such a case as this to make an independent examination of the whole record." Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963). Moreover, the district court's conclusion that the circumstances gave police a sufficient interest in preventing violence to justify restricting appellants' speech is a mixed finding of law and fact which is entitled to independent scrutiny by an appellate court. See Cuyler v. Sullivan, 446 U.S. 335, 341-42, 100 S.Ct. 1708, 1714-15, 64 L.Ed.2d 333 (1980)
 
 
 [5]
 Strikingly similar to the instant case is Gregory v. City of Chicago, supra, in which spectators threw rocks and eggs at civil rights demonstrators and shouted threats such as "God damned nigger, get the hell out of here" and "Get the hell out of here or we will break your blankety blank head open." Id. at 128, 89 S.Ct. at 955. The Court in Gregory reversed a decision by the Illinois Supreme Court that police were justified in arresting and charging demonstrators with disorderly conduct because they feared violence by unruly spectators
 
 
 [6]
 It is one more indication of the poor fit between the statute and the circumstances of the demonstration that the ostensible purpose of the police in applying the statute (protecting appellants from potential violence) differed substantially from the purpose of the Georgia legislature in enacting it (assuring police freedom of action at the scene of an emergency)
 
 
 [7]
 Some courts have imposed a duty to protect speakers confronted by a hostile audience. See Kelly v. Page, 335 F.2d 114, 119 (5th Cir.1964). Not only did police in this case fail to offer such protection; there is some evidence, such as the threat made by Officer Kelly, that they contributed to the hostility of the crowd. It is noteworthy that those residents who threatened violence--the only participants in the demonstration who engaged in overtly threatening behavior--were neither approached nor arrested by police officers
 
 
 *
 The trial judge charged solely in terms of the Chicago ordinance. Neither the ordinance nor the charge defined disorderly conduct as the refusal to obey a police order." 394 U.S. at 112, 89 S.Ct. at 947
 
 
 [1]
 The majority states that the police failed to offer protection to petitioners and that the threat by Officer Kelly--that he would "kick [appellant Hill's] ass if he didn't get out of there"--contributed to the hostility of the crowd. (Ante, p. 730 and n. 7.) There was no evidence that Officer Kelly made such a statement except the testimony of defendant Hill. Moreover, I find no basis for the majority's finding that the alleged statement by Officer Kelly contributed to the hostility of the crowd. Even if the making of such a statement by Officer Kelly is accepted as fact, it must be remembered that the remark came after police had reasonably evaluated the situation as beyond their ability to control, and after repeated police requests to disperse, directed to petitioners both collectively and individually, were ignored. Furthermore, as the majority acknowledges, petitioners failed to respond even to this strong demand by Officer Kelly. Petitioners' disregard of such requests and demands is plainly proscribed by O.C.G.A. Sec. 16-10-30