**Holley RAUEN and Nikki Hartman, Plaintiffs,**

v.

**CITY OF MIAMI, et al., Defendants.**

**Case No. 06–21182–CIV.**

United States District Court, S.D. Florida, Miami Division.

Sept. 17, 2007.

Barry Morris Silver, Barry M. Silver PA, Boca Raton, FL, Mara Shlackman, Mara Shlackman PL, Fort Lauderdale, FL, Robert William Ross, Jr., Ross Law Firm, Lake Worth, FL, for Plaintiffs.

Beverly A. Pohl, Broad and Cassel, Alain E. Boileau, Dieter Klaus Gunther, Adorno & Yoss LLP, Fort Lauderdale, FL, Warren Bittner, Miami City Attorney's Office, Donald Mark Papy, City of Miami Beach, Miami, FL, Osnat Kate Rind, Cohen & Rind PA, Miami Lakes, FL, Dieter Klaus Gunther, Rosen Switkes & Entin P.L., Miami Beach, FL, for Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court for a hearing on June 12, 2007, on Defendant, City of Miami's ("the City['s]") Motion for Final Summary Judgment [D.E. 164]; and Defendants, John Timoney, Frank Fernandez, and Thomas Cannon's (the "Supervisors[']") Motion for Final Summary Judgment [D.E. 165], both of which were filed on April 30, 2007. The Court has carefully considered the parties' arguments and written submissions, the record, and applicable law.

### I. BACKGROUND

This action arises from the events surrounding the Free Trade Area of the Americas ("FTAA") ministerial hearings, which took place in Miami, Florida in November 2003. Plaintiffs, Holley Rauen ("Rauen") and Nikki Hartman ("Hartman"), who attended demonstrations during the FTAA meetings, contend that a concerted effort by the Defendants, along with other Defendants who have previously settled with Plaintiffs, to unlawfully limit protest at the FTAA, resulted in multiple violations of Plaintiffs' constitutional rights. Plaintiffs also assert state common law tort claims for battery and negligence against Defendants.

### A. City's Preparation for FTAA Demonstrations

In preparation for the demonstrations that were expected to take place at the FTAA meetings, the Miami Police Department ("Miami PD") enlisted assistance from other law enforcement agencies, including the Broward Sheriff's Office, the City of Miami Beach Police Department, the City of Hialeah Police Department, and others. Each of the agencies operated

under a Mutual Aid Agreement executed in November of 2003. In the Mutual Aid Agreements, the cooperating agencies agreed to provide operational assistance to the City of Miami during the FTAA meetings. (*See Defendants' Concise Statement of Material Facts ("Def. Stat. of Facts")* [D.E. 163] atp. 16, ¶¶ 2–3; *Affidavit of Deputy Chief Frank Fernandez ("Fernandez Aff.")* [D.E. 167] at ¶¶ 2–3 & Ex. A(Mutual Aid Agreement between City of Miami and City of Miami Beach)). During the course of their preparation for the protests, the City of Miami and its cooperating agencies also developed Rules of Engagement, which set forth the protocols for use of force against demonstrators and which the cooperating agencies agreed to abide by in providing assistance to the City. (*See Def Stat. of Facts* at p. 16, ¶¶ 4–5; *Fernandez Aff.* at ¶¶ 4–5 & Ex. B).

The Miami PD also prepared a training presentation in PowerPoint in which it divided the expected FTAA demonstrators into three groups: the green group (nonviolent protestors, including union groups), the yellow group (nonviolent fringe elements), and the red group ("anti-government, anti-establishment" protestors). (*Ex. to Pl. Response Briefs* [D.E. 229] at Ex. 5, p. 17). The PowerPoint presentation also informed police officers that the passage of the FTAA and its decision to locate its headquarters in Florida would be "important" to the City of Miami, creating new jobs and otherwise improving the economy of South Florida. (*See id.* at pp. 8–9).

Plaintiffs assert that each of the cooperating agencies operated under the command and control of the Miami PD, and that then-Miami PD Captain Thomas Cannon was in command of field operations during the course of the FTAA demonstrations. (*See Plaintiffs' Response to Defendants' Concise Statement of Material Facts ("Pl. Stat. of Facts")* [D.E. 222] at

¶¶ 14–16; *Deposition of John Timoney ("Timoney Depo.")* [D.E. 227–7] at 62:3–7 (Apr. 16, 2007) ("Well, Captain Cannon would be overall in charge. There are multiple agencies that he may be giving directions to regarding whether to move a field force or go somewhere or stay here, and the expectation is that whatever he commands they will do.")). Plaintiffs also assert that each of the cooperating agencies acted pursuant to policies and procedures developed by the City of Miami for the FTAA event. (*See Pl. Stat. of Facts* at ¶ 17).

**B. Passage of City Code Section 54–6.1**

On November 13, 2003, days before the FTAA meetings, the Miami City Commission passed City Code Section 54–6.1, entitled "Parade and Assembly Prohibitions." That ordinance criminalized the possession, by any person gathered in a group of more than eight persons at a public place for a common purpose for more than 30 minutes, of a variety of objects, including, *inter alia,* glass bottles, stones, and pieces of metal or plastic outside certain size restrictions. (*See City's Reply* [D.E. 244] at Ex. C (certified copy of Section 54–6.1)).

The City Commission discussed Section 54–6.1 during its October 23, 2003 and November 13, 2003 meetings, and the minutes of those meetings include comments that provide, at a minimum, some evidence that the Commission intended to pass the ordinance specifically for purposes of the FTAA demonstrations. (*See Ex. to Pl. Response Briefs* at Ex. 1–2). Plaintiffs assert that Section 54–6.1 was used as a predicate for violent action by police officers at the FTAA demonstrations, pointing out that the Rules of Engagement agreed upon by the City and its cooperating agencies allowed for the use of force against demonstrators for violations of ordinances.

(*See Rules of Engagement, Fernandez Aff.* at ¶¶ 4–5 & Ex. B).

## C. Plaintiffs' Claims

During the course of the FTAA demonstrations, police clashed with demonstrators, including Plaintiffs, who allege that they suffered physical and mental injuries as a result. Plaintiffs allege that the City and its officers, along with the City's cooperating agencies, intentionally disrupted core political speech and other expressive activity "through the wrongful 'herding' of unarmed, peaceful demonstrators, and the systemic use of para-military tactics and offensive weapons." (*Third Amended Complaint* ("*TAC*") [D.E. 58-2] ¶ 1). Plaintiffs allege that Defendants' activities resulted in egregious violations of Plaintiffs' First and Fourth Amendment rights, and that the implementation of the joint operational security plan resulted in a "*de facto* suspension of constitutional rights in Miami" during the FTAA meetings. (*Id.*).

### 1. *Rauen's Alleged Injuries*

Rauen arrived on Biscayne Boulevard with a friend at around noon on November 20, 2003. (*See Deposition of Holley Rauen* ("*Rauen Depo.*") [D.E. 195] at 40, 71–72, 89). Rauen attended the FTAA protest as part of an anti-FTAA group called Living River. (*See id.* at 39). She participated in a planned march, which took about an hour, without incident. (*See id.* at 98–99). After the march, Rauen and her friends remained outside the Bayfront Park Amphitheater ("the Amphitheater") to sit on the lawn and have a picnic. (*See id.* at 99–101, 181).

At some point, a group of police officers lined up to the south of Rauen's group. (*See id.* at 101, 110). Rauen remained sitting in the same place for 45 minutes, got up and took photographs of the police officers, then sat down again. (*See id.* at 111). At one point, a group of people around Second Street marched up to the police line and made a lot of noise. (*See id.* at 115). Later, another line of police assembled, this one including officers wearing flak jackets and boots and holding shields and weapons. (*See id.* at 111). The line of police, still located to Rauen's south, appeared to Rauen to stretch from east to west all the way across Biscayne Boulevard to the west. (*See id.* at 122).

At that point, Rauen, who testified that she was becoming scared, began to gather her things to leave. (*See id.* at 111–114). Rauen does not recall hearing the police give any dispersal order. (*See id.* at 114). As she was beginning to leave, Rauen heard the police begin to hit their batons against their shields. (*See id.* at 116). People began screaming and Rauen heard "pop, pop, pop" noises. (*See id.* at 117).

Rauen was located in a crowd of people and the number of people prevented her from moving to the west or north (and the police line prevented her from moving to the south). (*See id.* at 117, 125, 138–139). She observed a number of barricades that kept protestors from moving in various directions. (*See id.* at 101–110). As she moved toward the Amphitheater, about a minute or two after the police began hitting their shields with their batons, Rauen was hit in the breast and knocked off her feet by what she believes was a bean bag projectile, which she believes came from the south (although she did not observe the officer who shot her). (*See id.* at 118, 126, 136–137, 185–186, 238).[1] Rauen remained on the ground crying, and when she got up, the majority of the police officers and demonstrators were gone. (*See id.* at 120–121).

---

**1.** Rauen's injury is shown on clip two of Plaintiffs' Video Exhibit 1, which is attached as an exhibit to the TAC.

Rauen proceeded back toward the Amphitheater, where she was treated by medics and later taken to the hospital, where she was treated for a hematoma and abrasions on her left breast, and then released. (*See id.* at 118, 123–125, 145, 223). The injury Rauen sustained matched a bean bag that was recovered from the ground at the site of the protest. (*See id.* at 136, 210–212).

## 2. Hartman's Injuries

Hartman attended the FTAA protest as part of a college group. (*See Deposition of Nikki Hartman* ("*Hartman Depo.*") [D.E. 199] at 34). On the afternoon of November 20, 2003, Hartman was sitting on the metal railing of the Amphitheater walkway when the police line began advancing while the officers hit their shields with batons. (*See id.* at 70, 85). As the police line advanced, Hartman ducked under the first Amphitheater railing, moving backwards. (*See id.* at 85–90). At that time, Hartman saw a black bandana, at which she pointed. (*See id.* at 70, 87–90). An unidentified officer nodded at her and kicked the bandana in her direction. (*See id.* at 70). Hartman grabbed the bandana and turned around to crawl under the second Amphitheater railing.[2] (*See id.*). As she did so, the officer bounced a gun off of her buttocks, and then shot Hartman in the right buttock with a projectile. (*See id.* at 70–72).

At some point shortly after this incident, Hartman returned to the police line, which had ceased moving, and sat in front of it in the lotus position. (*See id.* at 75–76, 90, 119–120). Hartman heard someone yell that a fire had been started, but she did not see the fire. (*See id.* at 78). Hartman testified that she never heard any police officer give a dispersal order. (*See id.* at 72). When she heard what sounded like gun shots at close range, Hartman stood up to leave. (*See id.* at 91, 119–120). As she turned away from the officers to run, Hartman was again shot with a projectile, this time in the shoulder. (*See id.* at 135–136). Hartman fell to her knees instantly. (*See id.* at 136). As she attempted to get up and run away, she again fell, and as she tried to get up with the assistance of others, she was shot in the head with what she believes was a pepperball. (*See id.* at 136–140).[3]

The people who attempted to come to Hartman's aid were also shot. (*See id.* at 139–140). Hartman ran from the police, arriving at the Wellness Center. (*See id.* at 140–141). Hartman was treated by medics at the scene, then transported to the hospital, where her head wound was stapled. (*See id.* at 92–95, 106, 140–141).

## D. Locations of Various Agencies' Officers

Plaintiffs' respective injuries were inflicted in approximately the same area east of Biscayne Boulevard near the Amphitheater and around approximately 4:00 p.m. on November 20, 2003.

According to Defendants, only SWAT teams were in possession of less lethal weapons (including those weapons with which Plaintiffs were injured). (*See Def. Stat. of Facts* at p. 19, ¶ 17). On November 20, 2003, the Miami PD had deployed four SWAT units, all of which were located either in the southbound traffic lanes, the northbound traffic lanes, or the center median of Biscayne Boulevard. (*See Def. Stat. of Facts* at p. 20, ¶ 22 (citing SWAT officer

---

**2.** Hartman is shown standing at the railing, then crawling under it, on Defense DVD 1. (*See* [D.E. 205] at ¶ 1, DVD entitled "On Biscayne Blvd.—11/20/03"—Police Line View 3 at 4:04).

**3.** Hartman is shown in the lotus position and being struck by projectiles in clip three of Plaintiffs' Video Exhibit 1, which is attached as an exhibit to the TAC.

affidavits); *Affidavit of Armando Guzman* [D.E. 180] at ¶¶ 2–8; *Affidavit of Rene Landa* ("*Landa Aff.*") [D.E. 168] at ¶¶ 2–8). At no time was any Miami PD SWAT officer located on the eastern sidewalk of Biscayne Boulevard or the grass to the east of Biscayne Boulevard (where Plaintiffs were located). (*See Def. Stat. of Facts* at p. 20, ¶ 23 (citing SWAT officer affidavits)). No member of any Miami PD SWAT unit, after reviewing the videotaped evidence in this case, recalls seeing either Rauen or Hartman during the course of the demonstrations. (*See id.* at pp. 22–23, ¶¶ 27–28 (citing SWAT officer affidavits)). The videotaped evidence indicates that the officers located on the eastern sidewalk and the grass east of Biscayne Boulevard were dressed in black uniforms with "PO-LICE" written on the chest area and were carrying shields on which the word "PO-LICE" was written in large letters. (*See Landa Aff.* at ¶ 12). During the demonstrations, Miami PD officers wore black uniforms with the letters "MPD" and a four-digit identification number printed in white lettering and did not carry shields. (*See id.*).

The FTAA After Action Report, which was compiled after the demonstrations, incorporates the Daily After Action Reports of the various agencies that participated in the police effort during the FTAA demonstrations. (*See Fernandez Aff.* at ¶¶ 7–8). The City of Miami Beach's Daily After Action Report for November 20, 2003 indicates that 100 pepper balls and one bean bag were deployed by the Miami Beach Police Department during the hour of 4:00 p.m. to 5:00 p.m. (*See id.* at ¶ 9 & Ex. C, p. 7). Other records indicate that on November 20, 2003, the Miami PD SWAT teams shot 310 pepper balls and 30 bean bags. (*See Ex. to Pl. Response Briefs* at Ex. 10) (Interoffice Memorandum from Miami PD Lt. Armando Guzman to Miami PD Captain Thomas Cannon (Jan. 21, 2004)).

## II. *LEGAL STANDARD*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir.1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

Finally, the Court may not credit any version of events that contradicts the videotaped evidence. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## III. *ANALYSIS*

### A. **Alleged Constitutional Violations**

In their Motions, the City and the Supervisors raise a number of arguments that they assert entitle them to summary judgment on each of Plaintiffs' claims against them. Several of those arguments are premised upon Defendants' assertion that Plaintiffs did not suffer any violation of constitutional rights. Accordingly, the undersigned first addresses the issue of whether Plaintiffs can demonstrate a genuine issue of material fact regarding whether their constitutional rights were, in fact, violated.

### 1. *Existence of First Amendment Violation*

■ In the TAC, Plaintiffs allege that Defendants' activities unconstitutionally deprived them of the right to engage in First Amendment-protected speech and assembly. As more fully set forth in the Court's March 2, 2007 Order on Motions to Dismiss, 2007 WL 686609 (the "March 2 Order"), the First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. It is well-established that peaceful protest is an expressive activity that constitutes protected "speech" under the First Amendment. *See United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

In their Motions, Defendants assert that no First Amendment violation occurred because the undisputed evidence demonstrates that the police were dealing with riot conditions and thus had the right to stop and disperse the protest. Defendants point to *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), in which the Supreme Court held that "[w]hen clear and present danger of riot, disorder, ... or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish [otherwise-protected speech] is obvious."

■ Determining whether police are authorized to curtail speech is a balancing act.

To interfere with ... protected conduct, the state must satisfy a heavy burden: it must not only demonstrate a substantial interest in regulating the speech in question, but it must show that the statute under which it regulates such conduct "does not broadly stifle fundamental liberties when the end can be more narrowly achieved."

*Sabel v. Stynchcombe,* 746 F.2d 728, 730 (11th Cir.1984) (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)). Defendants assert that the videotaped accounts of the activities of November 20, 2003 demonstrate that, in dispersing the FTAA protest, the police were acting to protect the public and avert a riot, as evidenced by both the violent actions of the protestors and the police officers' repeated dispersal orders.

Plaintiffs appear to agree with Defendants' statement of the law, while only taking issue with Defendants' interpretation of the record. Plaintiffs assert that at the time they were assaulted by the police, they were involved in peaceful protest and that the police were not entitled to disperse the crowd. Plaintiffs also dispute whether the police gave a dispersal order prior to assaulting the protestors. The undersigned must therefore review the record to determine whether any genuine issue of material fact exists.

Defendants point in particular to the affidavit of Angel Calzadilla, the Executive Assistant to the Chief of Police for the City of Miami Police Department. (*See Calzadilla Aff.* [D.E. 166] ). Calzadilla avers that he was tasked, along with Burden, with giving orders, including dispersal orders, via bullhorn during the FTAA protests. (*See id.* at ¶ 2). Calzadilla summarizes the events preceding Plaintiffs' injuries as follows:

> At approximately 3:34 p.m., a massive crowd suddenly surged, attacked and confronted the police line on N.E. 1st Street. From this point forward, while on Biscayne Boulevard, and while the police line moved incrementally Northward starting and stopping, until it ultimately turned Westbound on N.E. 3rd Street, it encountered rocks, bottles, marbles shot from sling shots, and other acts of violence. During this time, dispersal orders advising that the assembly was unlawful, and commanding the protestors to leave the area, were repeatedly and continuously given, and especially prior to each movement of the police line.

(*Id.* at ¶ 5). Attached as Exhibits A and B to Calzadilla's affidavit are two DVDs containing video clips of the events that occurred on Biscayne Boulevard on November 20, 2003.

Plaintiffs contradict Defendants' statement of events by pointing to a number of affidavits and to Plaintiffs' video exhibits 1 and 4, which are attached as exhibits to the TAC. Plaintiffs point first to the affidavit of Jeffrey Keating, a freelance videographer who shot a number of Plaintiffs' exhibit videotapes, including Plaintiffs' Exhibit 4. (*See Keating Aff.* [D.E. 229–7] at ¶¶ 1, 3). Keating avers that after an AFL–CIO march, which ended at about 3:00 p.m. or 3:30 p.m.,

> a police line formed that stretched from the Amphitheater grounds fence on the east side of the Bayfront park lawn all the way to the west side of Biscayne Blvd., running parallel to the northern perimeter fence of the F.T.A.A. security zone. I noticed a group move toward the police line, with drums beating and people chanting various slogans. There was no violence on the part of the demonstrators. Suddenly, and with no advance warning, the police on the line began beating their shields and marching as a solid group northward, while telling for the crowd to move back.
>
> ... I observed the police begin shooting a variety of weapons at demonstrators, who appeared to be unarmed and non-threatening....
>
> ... A few minutes after the police began firing chemical agents and hard projectiles into the crowd the police line suddenly stopped, and they re-formed into a straight line.... I was now walking

back to the north and saw that the police lines had the demonstrators completely surrounded on three sides at this point, with a small opening appearing at NE 3rd Street....

... I began walking in a westbound direction on NE 3rd Street. I should add that at no point did I hear any "dispersal order," or any warning that chemical weapons would be discharged into the crowd.

(*Id.* at ¶¶ 8–12).

As stated, the Court may not credit any version of events that contradicts the videotaped evidence. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The undersigned has reviewed the videotaped evidence submitted by both parties and finds that that evidence does not conclusively support either Plaintiffs' or Defendants' contrasting version of events. Both the videotaped evidence and the remainder of the record demonstrate that genuine issues of material fact exist regarding whether, at the time they prevented Plaintiffs from demonstrating, the police were dealing with riot conditions that would justify their dispersal of the crowd. Because the premise for Defendants' position is disputed, that is, the existence of riot conditions, summary judgment is not warranted on the issue of whether Plaintiffs' First Amendment rights were violated.

### 2. *Existence of Fourth Amendment Violation*

■ In the TAC, Plaintiffs allege that Defendants' activities violated their Fourth Amendment right to be free from unreasonable search and seizure. Specifically, Plaintiffs assert that Defendants unlawfully seized them by "herding" them and by assaulting them with less-lethal weapons. (*See, e.g., TAC* ¶ 62). In their Motions, Defendants assert that neither Plaintiff was seized within the meaning of the Fourth Amendment because neither Plain-

tiff was stopped, detained, or arrested and each Plaintiff walked away on her own after being struck. As a result, Defendants argue, Plaintiffs were dispersed (and possibly assaulted or battered by police officers), but not "seized."

In the March 2 Order, the undersigned analyzed Plaintiffs' Fourth Amendment claims as follows:

... The TAC alleges that Defendants employed a tactic of "herding" in which they created a large "encirclement perimeter" and used hundreds of heavily-armed, riot gear-clad officers in SWAT units and FTAA-specific "field forces" in a skirmish line to force demonstrators in a desired direction through use of intensely excessive force.

(*See TAC* ¶ 40). During the course of Defendants' activities, Hartman was allegedly engaged in a prayer vigil on the lawn on the east side of Biscayne Boulevard and was shot without reason on multiple occasions by law enforcement officers. (*See id.* ¶ 6). Rauen was allegedly standing peacefully on the grass near the Bayfront Amphitheater when she was shot without reason by officers. (*See id.* ¶ 7).

The encirclement perimeter consisted of the following: on the southern boundary, the skirmish line formed from Biscayne Bay on the east to the buildings on Biscayne Boulevard on the west side, with a huge FTAA-specific security fence surrounding the Intercontinental Hotel to the rear of the skirmish line. (*See id.* ¶ 41). The eastern boundary was Biscayne Bay near the Intercontinental Hotel, a little north of that the Bayfront Amphitheater was the eastern boundary, and north of the Amphitheater, several armored personnel carriers and the Hialeah Police Department field force blocked off access to Bayside and the port area to the east. (*See id.*).

The western boundary of this encirclement perimeter was a line of riot police and bicycle response platoons blocking movement. (*See id.*). Finally, the northern boundary consisted of the Miami–Dade County Police Department blocking movement. (*See id.*).

In the process of herding the demonstrators, the officers used batons to beat them and sprayed pepper spray up and down the lines, while using bean bags, pepper spray balls, OC spray rounds, and tear gas. (*See id.* ¶ 43). Hartman, who was praying while seated in the lotus position on the grass, was shot in the head, back and legs on multiple occasions. (*See id.*). Hartman submitted to the show of authority after being shot by moving northbound in an effort to retreat from the oncoming skirmish line. (*See id.*). An officer shot Rauen in the chest at close range with a projectile. (*See id*). She, too, submitted to Defendants' show of authority by moving eastbound, closer to the Amphitheater, as police began shooting demonstrators and discharging chemical weapons. (*See id.*).

It can hardly be disputed that the TAC sufficiently alleges that Plaintiffs' freedom of movement was terminated by the deliberate use of force and skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not have been. Construing the allegations in the light most favorable to Plaintiffs, the undersigned finds that Plaintiffs have sufficiently alleged an unreasonable seizure within the meaning of the Fourth Amendment.

(*March 2 Order* [D.E. 131] at 12–14).

Defendants assert that the record as since developed in this case does not support Plaintiffs' version of events as set forth in the TAC, and that the record evidence does not support a finding that Plaintiffs were seized within the meaning of the Fourth Amendment. Plaintiffs assert that there is a genuine issue of material fact regarding whether Plaintiffs were, in fact, subject to encirclement and herding.

A review of the record, including the depositions of Rauen and Hartman and the videotaped evidence, indicates that no genuine issue of material fact exists regarding whether Rauen and Hartman were "herded." All evidence indicates that police officers formed a line horizontally across Biscayne Boulevard, then moved northward, encountering demonstrators, including Hartman and Rauen. While there was some testimony that barricades had been erected, limiting demonstrators' movement, the undisputed evidence shows that both Rauen and Hartman were confronted by the advancing police officers, who injured them with projectiles, then passed them by, continuing to move north on Biscayne Boulevard. Under these undisputed facts, there is no evidence that either Rauen or Hartman was "herded" by the advancing police line.

While the Court's review of the evidence indicates that some demonstrators may have been herded, it also indicates that Rauen and Hartman were not. Accordingly, Defendants are entitled to summary judgment on all claims premised upon alleged violations of Plaintiffs' Fourth Amendment rights.

**B. Plaintiffs' *Monell* Claims (Counts One Through Four of the TAC)**

1. *Counts 1 & 2:* Monell *Claims Arising From First Amendment Violations*

■ Having found that a genuine issue of material fact exists regarding whether Plaintiffs' First Amendment rights were violated, the undersigned must determine if any factual dispute exists regarding whether such violations resulted from a

City policy or custom, or from the implementation of the City's policies or customs by its final policymaker, Chief Timoney. The City asserts that Plaintiffs have failed to demonstrate evidence of a City policy or custom that resulted in a violation of their constitutional rights.

Plaintiffs based their *Monell* claims[4] upon: (1) the City Commission's adoption of Section 54–6.1; (2) the City's entry into Mutual Aid Agreements with the cooperating agencies; and (3) the Miami PD's adoption of a "joint operational security plan," which Plaintiffs contend had unwritten components allowing police officers to profile protestors and violate their First and Fourth Amendment rights. (*See TAC* ¶¶ 51–52).

In this regard, the March 2 Order provided as follows:

> The TAC clearly alleges that the Municipal Defendants developed, and submitted to, several plans and agreements, the purpose of which was to stifle protest at the FTAA. It is not material that part of this policy or plan was unwritten. Moreover, the TAC asserts that the allegedly unconstitutional acts of the officers were taken in accordance with the unwritten and written plans and agreements.
>
> . . .
>
> Defendants' reliance on *Kesser v. City of Miami,* Case No. 04–22608–Civ–Jordan, (*see BSO Mot.* at 8–9), is misplaced, as there, no city policy, custom or practice had been identified after discovery, and summary judgment was granted on the section 1983 claim. The Federal Rules of Civil Procedure require that Plaintiffs be given the opportunity, through discovery, to determine whether officials with ultimate decision making responsibility instituted the alleged policies in

question, and be permitted to show the requisite causal link between the alleged municipal actions/plans agreed to and the deprivation of federal constitutional rights.

(*March 2 Order* at 17–19). The issue at this stage, then, with discovery concluded, is whether Plaintiffs have satisfied their burden of demonstrating some evidence of a City policy or custom that resulted in the alleged violation of their First Amendment rights.

The City first argues that there is no evidence of any causal connection between either the passage of Section 54–6.1 or the City's entry into Mutual Aid Agreements and Plaintiffs' alleged injuries. According to the City, there is no evidence that either Plaintiff was targeted under or arrested pursuant to Section 54–6.1 or that any police officer who targeted Plaintiffs was acting pursuant to the ordinance. There is also no evidence, according to the City, that the Mutual Aid Agreements, which simply provided that other law enforcement agencies would assist the City with the FTAA protests, had any connection to any deprivation of Plaintiffs' First Amendment rights. The City also argues that there is no record evidence of any unwritten component of the joint operational security plan that allowed political and ideological profiling, harassment and herding of protestors, or any other activity that would constitute a violation of Plaintiffs' constitutional rights. In their Response, Plaintiffs cite to *Board of County Commissioners v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), in which the Supreme Court stated that "the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law

---

**4.** The March 2 Order contains a full discussion of the elements of a *Monell* claim and the limitations of *Monell* liability. (*See March 2* *Order* at 14–19). That discussion is not repeated here.

will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." Plaintiffs assert that the City's actions in passing Section 54–6.1 violated the First Amendment because the purpose of the ordinance was to restrict speech and assembly during the FTAA. They point to, among other things, statements made by the City Commissioners about the FTAA while the Commission was contemplating passing Section 54–6.1. Even if the ordinance itself was unconstitutional, however, there would not necessarily be a sufficient nexus between the passage of the ordinance alone and Plaintiffs' alleged injuries to support a *Monell* claim.

■ Plaintiffs also argue that the Mutual Aid Agreements themselves resulted in their alleged violations of rights because without the agreements, the City would not have had the manpower to engage in constitutional violations. This argument is contrary to logic and does not persuade. The fact that the City asked for assistance from other agencies cannot, by itself, amount to a policy of violating constitutional rights.

The undersigned is persuaded, however, by Plaintiffs' final argument: that unwritten components of the joint operational security plan may have encouraged police officers' unlawful profiling of protestors, resulting in violations of those protestors' First Amendment rights. Among other things, evidence that the Miami PD divided protestors into color-coded "groups" in their training, and evidence of statements made by police officers after the FTAA event praising the way in which the demonstrations were handled, are sufficient to create a genuine issue of material fact regarding whether the City adopted a poli-

cy or custom that resulted in the violation of Plaintiffs' First Amendment rights. While there is no direct evidence of an express policy, there is certainly circumstantial evidence. Accordingly, the City is not entitled to summary judgment on Counts One and Two of the TAC.[5]

### 2. Counts 3 & 4: Monell *Claims Arising From Fourth Amendment Violations*

Having found that Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claims, the undersigned does not address Counts Three and Four of the TAC.

### C. Plaintiffs' Conspiracy Claims (Counts Twenty–One and Twenty–Two of the TAC)

■ In Count Twenty–One of the TAC, Plaintiffs allege that the Municipal Defendants had an "unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating the First Amendment rights of speech, assembly, and association of Plaintiffs and other demonstrators." (*TAC* ¶ 166). Plaintiffs further allege that this "unwritten agreement" was entered into in the course of the "months of planning leading up to the FTAA, including the mutual aid agreements and the Joint Law Enforcement Command." (*Id.*). Plaintiffs also assert that the Municipal Defendants implemented their plan through the formation, on November 20, 2003, of police lines that herded demonstrators and subjected demonstrators, including Plaintiffs, to overwhelming force, and that the conspiracy was the proximate cause of the deprivation of Plaintiffs' First Amendment rights. (*See id.* ¶¶ 167–169).

---

**5.** The City argues that because there is no evidence that Plaintiffs were injured by a Miami PD officer, it is entitled to summary judgment on Plaintiffs' *Monell* claims. However,

Plaintiffs would be entitled to recover against the City if the jury were to find that the City adopted a policy that led to, for example, a Miami Beach police officer injuring Plaintiffs.

In order to establish the existence of a civil conspiracy, Plaintiffs must demonstrate "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *Bivens Gardens Office Bldg. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 912 (11th Cir.1998). In its Motion, the City asserts that Plaintiffs have failed to demonstrate genuine issues of material fact with respect to these elements.

In their Response, Plaintiffs assert that Timoney's testimony that he met with heads of other law enforcement agencies and came to an agreement regarding the Rules of Engagement suffices to demonstrate the required agreement to achieve an illegal objective. The Rules of Engagement themselves allow the use of shields and batons, among other things, to prevent or stop violations of Section 54–6.1. (*See Fernandez Aff.* at Ex. B). The Rules of Engagement do not, however, allow the use of less-lethal weapons in response to violations of the ordinance, instead providing for the use of such weapons only in response to a threat of imminent physical harm to officers. (*See id.*).

Even assuming that the Rules of Engagement themselves allowed for violations of protestors' civil rights, Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to causation. The alleged violation of Plaintiffs' First Amendment rights did not result from Plaintiffs' violation of the ordinance and thus, any actions taken against them by officers were not tied to the Rules of Engagement. Although it is possible that the

Municipal Defendants' agreement to the Rules of Engagement violated some protestors' rights, there is no genuine issue regarding whether it resulted in the violation of *Plaintiffs'* First Amendment rights. Accordingly, the City is entitled to summary judgment on Count Twenty–One of the TAC.[6]

Because Count Twenty–Two of the TAC is premised upon an alleged violation of Plaintiffs' Fourth Amendment rights, summary judgment will be entered for the City on that Count as well.

### D. Plaintiffs' Supervisory Liability Claims Against the Supervisors (Counts Seven, Nine, and Eleven of the TAC)

██ In Counts Seven, Nine, and Eleven of the TAC, Plaintiffs allege that the Supervisors directed unlawful acts that resulted in the violation of Plaintiffs' First Amendment rights.[7] In their Motion, the Supervisors assert both that Plaintiffs did not suffer a violation of their First Amendment rights and that each of the Supervisors is entitled to qualified immunity. The undersigned has already determined that Plaintiffs have demonstrated a jury issue regarding the violation of their First Amendment rights and therefore addresses only the qualified immunity issue.

██ Government supervisors may be held liable for constitutional violations committed by their subordinates when either "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection be-

---

6. This conclusion is not inconsistent with the Court's denial of summary judgment on Plaintiffs' *Monell* claims. The *Monell* claims require that the City adopted a policy or custom that *resulted in* a violation of Plaintiffs' rights, while the conspiracy claim requires that the City entered into an *agreement to violate* Plaintiffs' rights.

7. In Count Seven, Plaintiffs assert a First Amendment supervisory liability claim against Chief Timoney. (*See TAC* ¶¶ 79–84). In Count Nine, they assert the same claim against Fernandez. (*See TAC* ¶¶ 91–95). In Count Eleven, they assert the same claim against Cannon. (*See TAC* ¶¶ 101–106).

tween actions of the supervising official and the alleged constitutional violation." *Braddy v. Florida Dep't of Labor & Empl. Sec.,* 133 F.3d 797, 802 (11th Cir.1998) (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)) (internal quotation marks omitted). Supervisors are entitled to qualified immunity, however, unless "a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff. . . ." *McKinney v. DeKalb County,* 997 F.2d 1440, 1443 (11th Cir.1993).

The Supervisors argue that because they were faced with riot conditions, they could not have known that their actions in dispersing the crowd would violate Plaintiffs' (or other protestors') First Amendment rights. As previously stated in this Order, a genuine issue of material fact exists with respect to whether the Supervisors were faced with riot conditions and whether the officers were justified in dispersing the crowd. Accordingly, the Supervisors are not entitled to summary judgment on Counts Seven, Nine, and Eleven of the TAC.

### E. Plaintiffs' State Law Tort Claims (Counts Twenty–Three and Twenty–Four of the TAC)

In Counts Twenty–Three and Twenty–Four of the TAC, Plaintiffs assert state law battery and negligence claims against the City. The City contends that it may not be held liable under a respondeat superior theory because the undisputed facts demonstrate that it was not City officers who injured Plaintiffs and the City is liable only for actions of its own employees, not employees of other agencies. The City also contends that its waiver of sover-

eign immunity only extends to actions taken by the City's own employees, not employees of other agencies.[8] Finding that the undisputed evidence supports the City's assertion that Plaintiffs' injuries were inflicted by non-Miami PD officers, the undersigned addresses these arguments in turn.

#### 1. *Respondeat Superior Liability*

■ In support of its argument, the City cites to *Stinson v. Prevatt,* 84 Fla. 416, 94 So. 656, 657 (1922), in which the court held that general principles of common law provided for liability of an employee where an employee committed a wrongful act in the scope of his or her employment. The *Stinson* court did not address the issue of whether an employer may also be vicariously liable for the acts of its non-employee agents.

The law is clear that respondeat superior (or vicarious) liability attaches to a principal for the tortious acts of its agents, even when the principal and agent do not have an employer-employee relationship. *See, e.g., Molina v. Watkins,* 824 So.2d 959, 963 (Fla. 3d DCA 2002) ("The law is settled that where an agent or employee is found to have no liability, then a judgment cannot stand against the principal or employer on the basis of vicarious liability or respondeat superior."); BLACK'S LAW DICTIONARY 1338 (8th ed. 2004) (defining respondeat superior as "[t]he doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency"). Accordingly, should the officers who inflicted Plaintiffs' alleged injuries be found to have acted within the

---

8. In its Fourth Notice of Reliance Upon Supplemental Authority [D.E. 270], received by the undersigned on this date, the City attempts to raise the argument that it is entitled to summary judgment on Plaintiffs' negligence claim because there is no cause of

action for "negligent use of excessive force." The City has provided no explanation for its failure to raise this argument in its Motion and Plaintiffs have had no opportunity to respond. Accordingly, this argument will not be considered.

scope of an agency relationship with the City, the City may be held liable for the officers' actions, and the City is not entitled to summary judgment on this basis.

2. *Waiver of Sovereign Immunity*

 The relevant portion of Florida's limited waiver of sovereign immunity provides:

.... The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer **of which the officer, employee, or agent is an employee,** unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions shall not be liable in tort for the acts or omissions of **an officer, employee, or agent committed while acting outside the course and scope of her or his employment** or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a) (emphasis added). The City asserts that, notwithstanding the statute's reference to "officer[s], employee[s], or agent[s]," the boldfaced portions of the statute indicate that a municipality may be held liable only for acts of employees acting within the scope of their employment.

In its Motion, the City provides no cases that support its reading of the statute, and in their Response, Plaintiffs do not directly address this argument. The City did provide, via a Notice of Reliance Upon Supplemental Authority [D.E. 251], two cases it asserts are relevant to the Court's resolution of this issue. *See McGhee v. Volusia County,* 679 So.2d 729, 733 (Fla.1996); *Willingham v. City of Orlando,* 929 So.2d 43, 47–48 (Fla. 5th DCA 2006). The City provides no explanation for its failure to provide these cases in its Motion. In any event, however, the undersigned has reviewed the cases and finds that they fail to address the question at issue here: whether a municipality may be held liable in tort for the actions of its non-employee agents.

In its Notice of Reliance Upon Supplemental Authority, the City also quotes from another subsection of Florida's sovereign immunity statute. That subsection provides as follows:

In accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury or death caused by the negligent or wrongful act or omission of **any employee of the agency or subdivision while acting within the scope of the employee's office or employment** under circumstances in which the state or such agency or subdivision, if a private person, would be held liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.

Fla. Stat. § 768.28(1) (emphasis added). Again, the City has provided no explanation for its failure to include a reference to this subsection in its Motion. However, given the centrality of the sovereign immunity statute to the issue at hand, the undersigned finds that Plaintiffs were on no-

tice of the City's reliance on the statute as a whole.

■■■■ The issue presented is strictly one of statutory construction. It is a well-known maxim of statutory construction that a court must begin "with the language of the statute itself." *In re T.H. Orlando Ltd.*, 391 F.3d 1287, 1291 (11th Cir.2004) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). Under Florida law,

> Before resorting to the rules of statutory interpretation, courts must first look to the actual language of the statute itself. *Joshua v. City of Gainesville*, 768 So.2d 432, 435 (Fla.2000); *accord BellSouth Telecomms., Inc. v. Meeks*, 863 So.2d 287, 289 (Fla.2003). As this Court has often repeated:
> "When the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent. *See Lee County Elec. Coop., Inc. v. Jacobs*, 820 So.2d 297, 303 (Fla.2002). In such instance, the statute's plain and ordinary meaning must control, unless this leads to an unreasonable result or a result clearly contrary to legislative intent. *See State v. Burris*, 875 So.2d 408, 410 (Fla.2004). When the statutory language is clear, 'courts have no occasion to resort to rules of construction—they must read the statute as written, for to do otherwise would constitute an abrogation of legislative power.' *Nicoll v. Baker*, 668 So.2d 989, 990–91 (Fla. 1996)."

*Koile v. State*, 934 So.2d 1226, 1230–31 (Fla.2006) (quoting *Daniels v. Florida Dep't of Health*, 898 So.2d 61, 64–65 (Fla. 2005)).

Here, the plain language of the statute contains seemingly contradictory expressions: the statute provides that the state waives its sovereign immunity with respect to actions taken by "officer[s], employee[s], or agent[s]," but then the waiver applies only in the context of actions against the agency of which the "officer, employee, or agent" "is an employee[.]" Fla. Stat. § 768.28(9)(a). The statute also provides that the state does not waive immunity with respect to acts committed by the "officer, employee, or agent" "outside the course and scope of ... employment," but the term "employment" is left undefined. *Id.* Subsection (1) of the statute seems to limit the waiver to apply to actions of "employees ... acting within the scope of [their] employment[.]" Fla. Stat. § 768.28(1).

While the plain language of the statute does not adequately address the issue of whether a municipality may be held liable in tort for the actions of its non-employee agents, read as a whole, the undersigned concludes that it does so cover that arrangement. If the legislature intended only to waive immunity for acts of municipal employees, it could simply have said so. But it did more than that. It included the terms agent and officer to reach a situation such as the present one, where others act at the behest of government, and commit acts within the scope of their "employ" as government agents.

To construe the statute as the City urges is to leave superfluous the additional terminology included in the statute, and to leave without redress claimants whose injuries were caused by government agents not "on the payroll." The term employment, left undefined in the statute, must be construed consistent with the terms added in the statute, that is, agent and officer acting within the scope of their employment.

Accordingly, the undersigned rejects the narrow interpretation of the Florida sover-

eign immunity statute advanced by the City.[9]

## IV. *CONCLUSION*

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant, City of Miami's Motion for Final Summary Judgment [D.E. 164] is **GRANTED IN PART and DENIED IN PART** as follows:

 (a) As to Counts Three, Four, Twenty–One, and Twenty–Two, the City's Motion is **GRANTED.** Judgment for the City on these counts shall be entered by separate Order.

 (b) As to Counts One, Two, Twenty–Three, and Twenty–Four, the City's Motion is **DENIED.**

2. Defendants, John Timoney, Frank Fernandez, and Thomas Cannon's Motion for Final Summary Judgment [D.E. 165] is **DENIED.**

**9.** On this date, the undersigned received from the City a Third Notice of Reliance Upon Supplemental Authority [D.E. 269], which contains citations to authorities addressing sovereign immunity. Despite the lateness of the City's filing, the undersigned has reviewed the cases cited therein and finds that they do not alter the result reached.